**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 8 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MAYRA PORTILLO and AURA
PORTILLO,

      Petitioners,

v.

IMMIGRATION &
NATURALIZATION SERVICE,

      Respondent.

No. 97-9572

(A72 528 591
 A72 530 761)

(Board of Immigration Appeals)

**ORDER AND JUDGMENT**  *

Before **ANDERSON** , **HENRY** , and **MURPHY** , Circuit Judges.

      Ms. Mayra and Ms. Aura Portillo-Morales ("Portillo"), natives and citizens

of Guatemala, petition this court to review the final deportation order of the

Board of Immigration Appeals (BIA or "Board"), denying their requests for

asylum and withholding of deportation. We exercise jurisdiction under 8 U.S.C.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

§ 1105a(a), [1] and deny the petition.

## A. Background

Mayra and Aura Portillo applied for asylum in September 1994. They argued they had a well-founded fear of persecution based on their involvement and that of their family in a literacy group and in the Christian Democratic party. They testified that in June or July of 1990, as members of a literacy group in Izabal, Guatemala, they received threats from the G2, a military group. Two members of their literacy group were kidnapped, one of whom was murdered. In November, 1990, they relocated to Chiquimula to escape such threats. On the way there, they were "car-jacked" and again threatened.

Once in Chiquimula, they became involved in the Christian Democratic Party, organizing and distributing leaflets. They stated they subsequently received additional threats by phone and letter, and that several relatives had been threatened, shot, or killed. They fled Guatemala and entered the United

[1] Section 1105a was repealed by § 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, which alters the availability, scope, and nature of judicial review in INS cases. Because petitioners' deportation proceedings commenced before April 1, 1997, IIRIRA's permanent "new rules" do not apply to this case. See id. § 309(c)(1). However, IIRIRA's "transitional rules" do apply, because in this case the agency's final order was filed more than thirty days after IIRIRA's September 30, 1996 date of enactment.    See id. § 309(c)(4). The repeal of § 1105a is not effective in cases such as this one where the transitional rules are in effect. See id.

States in December, 1991.

At their deportation hearing, the Portillos presented testimony from their sister, Olga, who had been with them in Guatemala and testified to the same events. They noted that Olga had been granted asylum in a separate proceeding on February 14, 1995. The Portillos also offered the testimony of Dr. Robert H. Trudeau, a Guatemalan human rights expert. The Immigration Judge (IJ) accepted an affidavit from him into evidence but refused to allow him to testify, stating that because the petitioners and the INS had been disorganized and inefficient in the presentation of evidence, the IJ would not take more court time with the case.

In January, 1996, the IJ denied the Portillo sisters' request for asylum. The IJ questioned the sisters' credibility, noting discrepancies between their initial applications and their subsequent testimony, discrepancies between the two sisters' testimony, a lack of corroborative evidence, and that the Christian Democrats had been in power at the time of the claimed threats, making it unlikely that the sisters had been persecuted for their party involvement. The petitioners appealed.

In October, 1997, the BIA affirmed the IJ's orders, agreeing that petitioners had not demonstrated a well-founded fear of persecution. The BIA found that, even assuming that petitioners were threatened, the record did not contain

sufficient evidence that the source of the threats had been the government; thus, to be eligible for asylum, petitioners needed to make the alternate showing that they faced a *country-wide* threat of persecution. In light of the United States Department of State's 1995 Profile of Asylum Claims and Country Conditions for Guatemala stating that "most low-profile victims of localized harassment can avail themselves of relocation away from the area where they had problems," see Certified Administrative Record ("C.A.R.") at 190, the BIA concluded that the Portillos had not made the requisite showing. Finally, the BIA found that they were not prejudiced by the exclusion of their expert's testimony because he would not have testified that the threat was country-wide, thus the result would have been the same.

## B. Discussion

The asylum process has two steps. First, an alien requesting asylum must show that "she is a refugee by proving either past 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Nguyen v. INS, 991 F.2d 621, 625 (10th Cir. 1993) (quoting 8 U.S.C. § 1101(a)(42)). The petitioner bears the burden of proving that he is a refugee within the statutory definition. See Rezai v. INS, 62 F.3d 1286, 1289 (10th Cir.1995). Second, once an alien has established her refugee status, the Attorney General may apply her discretion in

4

granting asylum.  Id.

*1. Determination of Refugee Status*

Appealing from a BIA decision, petitioners face a heavy burden.  We must uphold the BIA's decision unless petitioner's evidence was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."  INS v. Elias-Zacarias, 502 U.S. 478, 484 (1992). "Even if we disagree with the Board's conclusions, we will not reverse if they are supported by substantial evidence and are substantially reasonable."  Kapcia v. INS, 944 F.2d 702, 707 (10th  Cir. 1991).

Here, petitioners argue the BIA erred by finding they had not proved a well-founded fear of persecution based on the evidence they presented.  They point to their testimony as to their prior involvement in the literacy movement and with the Christian Democratic Party, their belief that they had been threatened in Izabal by the military group G2 and that they had been placed on a government "blacklist," subsequent threats against them in Chiquimula, their mother's letter confirming injuries to other family members, and various articles they submitted on similar human rights violations in Guatemala.

Yet, in order to establish the requisite persecution, petitioners must show that persecution emanated either (1) from the government or (2) from a non-governmental agency that the government is unwilling or unable to control.  See

5

Bartesaghi-Lay v. INS, 9 F.3d 819, 921 (10th Cir. 1993). If petitioners claim persecution by a non-governmental agency, they must make an additional showing that the threat against them is country-wide. See Matter of Acosta, 19 I&N Dec. 211 (BIA 1985) ("an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country -- he must show that the threat of persecution exists for him country-wide"), modified on other grounds by Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987).

Here, the BIA first found that the petitioners had not presented sufficient evidence that the source of threats was the government. We cannot say that this finding was not supported by substantial evidence when (1) the sisters testified only that they "pretty much knew," C.A.R. at 85, and "assumed," C.A.R. at 105, that the group threatening them was the military group G2 (because of its similar tactics), and (2) in light of the sisters' own expert's affidavit, on which the BIA relied, suggesting that threats to literacy workers were not governmental but were from "local landlords or factory owners" and threats to Christian Democratic Party workers were from "local level operatives" of a rival political party in electoral decline. See C.A.R. at 161. Petitioners' argument that their credibility must be presumed is both unavailing, when we "may not . . . determine the credibility of witnesses in this review of factual findings," Refahiyat v. INS, 29

6

F.3d 553, 556 (10th Cir.1994), and superfluous, when the BIA in fact "assum[ed] the respondents were threatened" as they claimed for purposes of making its evaluation. C.A.R. at 2.

The BIA then considered, contrary to petitioners' assertions, the second possibility that they faced persecution from a non-governmental group. It found that they had not made the requisite additional showing that they faced a country-wide threat. Again, we cannot say this finding was not supported by substantial evidence when (1) the Board relied on a March, 1995, United States Department of State Bureau of Democracy, Human Rights, and Labor profile of Guatemala stating that "most low-profile victims of localized harassment can avail themselves of relocation away from the area where they had problems," and (2) the record does not otherwise show that the petitioners could not have escaped persecution elsewhere in Guatemala.

Petitioners challenge this decision on several grounds. First, they argue the BIA improperly applied an elevated standard in its determination of whether they qualified as refugees. In its decision, however, the Board referred to the correct "reasonable possibility" of persecution standard articulated in INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987), and petitioners do not cite any specific language or other evidence indicating that the Board applied any other improper standard. Their argument essentially amounts to a suggestion that we

7

reweigh the evidence, which we are prohibited from doing. See Refahiyat , 29 F.3d at 556.

Second, petitioners argue that their move to Chiquimula shows they did try to relocate to escape persecution. This argument fails because evidence of persecution in two localized areas -- without more -- is insufficient to show they faced country-wide persecution, as required.

Third, they argue the Board improperly required them to show that they had a high public profile. This argument is similarly unavailing when the BIA considered their profile only in terms of determining whether they had demonstrated they faced the required country-wide threat.

Finally, petitioners contend that they need not show they would be singled out for persecution because they meet the alternative "pattern or practice" requirement. An alien need not show "he or she would be singled out individually for persecution if: (I) [she] establishes that there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant . . .; and (ii) [she] establishes his or her own inclusion in and identification with such group. . . ." 8 C.F.R. 208.13(b)(2)(I)-(ii). However, as the INS points out, petitioners did not argue this before the IJ or the BIA, and they are thus foreclosed from raising it now for failure to exhaust administrative remedies. See Rivera-Zurita v. INS , 946 F.2d 118, 120 n. 2 (10th Cir.1991).

8

Thus, we conclude that the BIA's finding that petitioners did not show that they qualified as refugees was supported by substantial evidence.

*2. Inconsistent Grant of Asylum*

Petitioners also challenge the BIA's denial of asylum to Mayra and Aura Portillo because it was inconsistent with its prior grant of asylum to their sister, Olga Portillo, on essentially the same facts. They cite Masonry Masters, Inc. v. Thornburgh for the proposition that the INS cannot "make simultaneously inconsistent decisions without providing some explanation for the inconsistency." 742 F. Supp. 682, 687 (D.D.C. 1990); see also Omni Packaging, Inc. v. INS, 733 F. Supp. 500 (D.P.R. 1990).

We review the Attorney General's decision as to whether to grant asylum under an abuse of discretion standard. Id. Because petitioners failed to satisfy their factual burden regarding anticipated persecution, however, we need not address the discretionary refusal of asylum from the alleged persecution. See Castaneda v. INS, 23 F.3d 1576, 1578 (10th Cir. 1994).

Further, as the INS points out, even were we to consider the Board's discretionary decision, unlike the identical visa petitions considered simultaneously in Masonry Masters, here the record is not sufficiently complete as to Olga's asylum application to determine whether it was identical to Mayra and Aura's, nor were their asylum requests considered simultaneously.

9

Additionally, having had evidence of Olga's asylum grant before them, both the INS and the BIA issued thorough opinions explaining their adverse decisions, thus satisfying the explanatory requirement articulated in Masonry Masters.

Nevertheless, we pause to make clear that we do find this inconsistency troubling. See Karapetian v. INS, 162 F.3d 933, 936 (7th Cir. 1998) ("The inconsistency the agency has shown -- issuing diametrically opposed judgments to members of the same family, all of whom sought asylum on the same . . . basis, and the same facts -- is very troublesome to us . . . ."). Unfortunately, like the Seventh Circuit in Karapetian, "we do not see where, under the highly deferential standard of review that applies to INS cases, we can take this fact into account." Id. We suggest that the Board should also find this inconsistency seriously troubling, and note that it might reconsider or reopen the Portillos' case on its own initiative, see 8 C.F.R. § 3.2(a), or upon a proper motion. Id. at § 3.2(c)(3). See also Karapetian, 162 F.3d at 937 ( "We note that a principal mission of the Board of Immigration Appeals is to ensure as uniform an interpretation and application of this country's immigration laws as possible." (parenthetically quoting In re Cerna, 20 I & N Dec. 399, 405 (BIA 1991))).

3. *Exclusion of Expert Testimony*

Finally, the Portillos contend that the district court erred in excluding the testimony of their expert witness, Dr. Trudeau. Aliens in deportation hearings

are entitled to a "full and fair hearing that comports with due process." Kapcia, 944 F.2d at 705. To establish a due process violation, an alien must show that an error resulted in prejudice "implicat[ing] the fundamental fairness of the hearing." Michelson v. INS, 897 F.2d 465, 468 (10th Cir. 1990). Here, although the IJ's exclusion of the testimony may have been questionable, there was no such fundamental error when the petitioners were permitted to submit as extensive an affidavit from Dr. Trudeau as they wished, and the only error they identify is that had he been permitted to testify, he "could have clarified points that were not brought out in his affidavit." Aplt. Br. at 18.

## C. Conclusion

Thus, after careful review of the administrative record, we conclude that substantial evidence supports the BIA's conclusion that petitioners have not established eligibility for asylum, there was no abuse of discretion in refusing to grant asylum to Mayra and Aura Portillo after having granted asylum to their sister, Olga Portillo, and there was no due process violation in excluding their expert's testimony when he was allowed to submit an affidavit. Thus, the petition for review is DENIED.

Entered for the Court,

11

Robert H. Henry
Circuit Judge