Khosrow **HADJIMEHDIGHOLI,**
Petitioner,

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 93–9563.

United States Court of Appeals,
Tenth Circuit.

March 1, 1995.

Nancy B. Elkind of Stern & Elkind, Denver, CO, for petitioner.

Richard M. Evans, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC (Frank W. Hunger, Asst. Atty. Gen. Civ. Div., Washington, DC, with him on the brief), for respondent.

Before KELLY, HENRY, Circuit Judges, and VAN BEBBER, District Judge.*

VAN BEBBER, District Judge.

Khosrow Hadjimehdigholi has petitioned this court to review the final deportation

*The Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas,

order and denial of his request for asylum and withholding of deportation by the Board of Immigration Appeals (BIA). We exercise jurisdiction pursuant to 8 U.S.C. § 1105a(a) and affirm.

## I. Factual and Procedural Background

Petitioner, a native and citizen of Iran, entered the United States with a valid visitor visa on April 20, 1988. On September 23, 1988, prior to the expiration of his visa, he submitted a request for asylum in the United States to the Immigration and Naturalization Service (INS). His request was denied on March 23, 1989, and the INS commenced deportation proceedings based on petitioner overstaying his visa. On May 30, 1989, petitioner conceded deportability but requested asylum and withholding of deportation. A hearing was held before an Immigration Judge (IJ) on September 25, 1989. The following factual summary is based on testimony and evidence submitted at that hearing.

Petitioner served in the Iranian armed forces from 1959 until 1986. He was an army tank officer until 1965 when he transferred to the air force and trained to become a pilot. He eventually became a flight instructor, a position he held until he retired in 1986. In 1984, petitioner was promoted to full colonel which was his rank at retirement. He received monthly retirement pay until he left Iran in 1988.

In 1963, while the Shah was still in power, petitioner was a third lieutenant and tank commander in the army. Followers of the Ayatollah Khomeini who were protesting land reform instituted by the government attempted a revolution. Petitioner was in charge of one of four tank units that were instrumental in quelling the uprising. He later received commendations for his role in putting down the revolt.

After Khomeini took power in 1979, the general who was in charge of quelling the 1963 revolt was executed. Petitioner's military records reflected his role in quashing the rebellion, but the records were apparent-

sitting by designation.

ly never discovered by the new government, and petitioner remained in the military. Shortly before petitioner left Iran he was involved in an argument with his uncle who was a supporter of Khomeini and a member of the pro-Khomeini Hezbollah party. The uncle stated that he knew what petitioner had done while in charge of the tank unit and the uncle threatened to tell authorities about petitioner's support of the Shah. Petitioner felt that it was only a matter of time before the authorities learned of his past loyalty to the Shah.

Petitioner and another pilot in his unit, Major Shahin Abbassi, were close friends. Major Abbassi confided in petitioner about plans to defect from Iran and encouraged petitioner to join him and leave the country. Petitioner declined because of concerns for his family. In April 1987, Major Abbassi pirated an Iranian military helicopter and escaped to Turkey with his family. He eventually received asylum in the United States. The Iranian government imposed two death sentences on Major Abbassi, one for deserting in time of war since he fled the country during the Iran–Iraq war, and the other for stealing the military helicopter. After he arrived in Turkey, and later in the United States, Major Abbassi communicated covertly with petitioner and urged him to also leave Iran. Petitioner was never questioned by Iranian authorities about Abbassi's defection. Since his arrival in the United States, petitioner has continued his association with Major Abbassi.

When petitioner decided to leave Iran in 1988 he did not inform the authorities of his intention to go to the United States. Because of his rank in the military and the timing of his departure, which came soon after a clash between the United States and Iran in the Persian Gulf, petitioner believed that Iranian authorities would have viewed his departure as a defection and a strong anti-government act deserving of punishment. Through contacts in the passport office petitioner was able to obtain a passport which omitted any indication that he was a retired military officer. This enabled him to leave Iran without securing a special exit permit.

Since petitioner's departure from Iran, authorities have questioned his wife regarding his whereabouts. Petitioner is concerned that his wife and other members of his family will be harassed or persecuted. Major Abbassi's brother was imprisoned soon after Abbassi left Iran.

At the hearing petitioner testified that he believed he would be sentenced to death if he returns to Iran. He cited the following reasons for this belief: his association with Major Abbassi, the likelihood that the Iranian government will learn of his support for the Shah during his military career and specifically his role in quelling the 1963 rebellion, his departure from Iran and travel to the United States, and the fact that his brother has become a United States citizen. Mr. Afshin Shariati, an Iranian citizen and permanent United States resident, also testified at the hearing. Mr. Shariati is associated with the Movement for the National Independence of Iran, a United States-based anti-Khomeini group. He testified that he believed petitioner would be executed if he returned to Iran because of his role in the 1963 revolt and because petitioner has been outspoken about his political opinions.

The Department of State's Bureau of Human Rights and Humanitarian Affairs submitted an advisory opinion. In its opinion, the agency stated that the allegations in petitioner's application for asylum, together with information available to it about conditions in Iran, failed to demonstrate that petitioner has a well-grounded fear of persecution upon return to Iran.

The IJ also had available to him two reports concerning conditions in Iran. The 1987 Amnesty International report indicated that hundreds of political arrests had been made during the preceding year and that thousands of political prisoners remained incarcerated with little hope of receiving a fair trial. The State Department's Country Reports on Human Rights Practices for 1987 contained no estimate of the number of political prisoners in Iran, and also indicated that there was a lack of procedural safeguards for prisoners in Iranian courts. The State Department report stated that travel outside Iran had become easier and that, with the

exception of some with close ties to the former regime, Iranians are generally able to return after long periods abroad without reprisal. There were, according to the report, unconfirmed reports that Iranians suspected of close association with the old regime being arrested upon their return to Iran.

At the conclusion of the hearing, the IJ denied petitioner's request for asylum and withholding of deportation but granted voluntary departure. Although the IJ found that petitioner had a legitimate fear of returning to Iran, the IJ held that petitioner did not establish that a reasonable person in petitioner's position would have a well-founded fear of persecution based on race, religion, nationality, membership in a social group, or political opinion.

On appeal, the BIA affirmed the IJ's decision and dismissed petitioner's appeal. Finding that petitioner's claim was based on speculation rather than hard evidence, the BIA held that petitioner had failed to establish that he has a well-founded fear of persecution. The BIA also rejected petitioner's claim that he was denied due process because of the incompetency of the translator during the hearing before the IJ.

## II. Analysis

Petitioner raises the following claims on appeal: (1) the BIA erred in finding that petitioner did not qualify for asylum or withholding of deportation because the BIA failed to apply the proper legal standards, and because the BIA's conclusions are not supported by substantial evidence; and (2) petitioner was denied due process of law as a result of prejudicial errors committed by the BIA and the IJ.

### A. Qualification for Asylum

"[T]he Immigration and Nationality Act [8 U.S.C. §§ 1101 *et seq.*] has provided two methods through which an otherwise deportable alien who claims that he will be persecuted if deported can seek relief." *INS v.*

*Cardoza–Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 1209, 94 L.Ed.2d 434 (1987). These two methods are asylum and withholding of deportation. Petitioner applied for and was denied both forms of relief.

■ The granting of asylum under 8 U.S.C. § 1158(a) is a two-step process.[1] In the first step, the alien must establish that he or she is a refugee as defined by statute. If an alien has established statutory eligibility as a refugee, then in the second step the Attorney General applies her discretion to grant or deny asylum. *Kapcia v. INS,* 944 F.2d 702, 706, 708 (10th Cir.1991). In this case, the IJ and BIA determined that petitioner did not qualify as a refugee, therefore in this appeal we are concerned only with the first step.

■ "To establish refugee status, the alien must prove either past 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.* at 706 (quoting 8 U.S.C. § 1101(a)(42)). The well-founded fear of persecution standard is comprised of both a subjective and an objective component. *Id.* The subjective component requires that the alien's fear be genuine. This is relevant only if the petitioner establishes that the fear is objectively reasonable by proving "facts that would support a reasonable fear that the petitioner faces persecution." *Id.* (quoting *Aquilera–Cota v. INS,* 914 F.2d 1375, 1378 (9th Cir. 1990)). Persecution has been defined as the offensive "infliction of suffering or harm" and encompasses "more than just restrictions or threats to life and liberty." *Baka v. INS,* 963 F.2d 1376, 1379 (10th Cir.1992) (quoting *Zalega v. INS,* 916 F.2d 1257, 1260 (7th Cir.1990)).

■ Petitioner also applied for withholding of deportation. Unlike asylum, the Attorney General has no discretion in a withholding of deportation proceeding if the "alien's life or freedom would be threatened

1. 8 U.S.C. § 1158(a) provides:

The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

... on account of race, religion, nationality, membership in a particular social group, or political opinion" in the alien's native country. 8 U.S.C. § 1253(h). In such cases, the Attorney General "shall not deport or return" the alien to that country. *Id.* To be eligible for such relief, the petitioner must establish a "clear probability of persecution" with "objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987). This standard is more stringent than the well-founded fear standard required to qualify for asylum. *INS v. Stevic,* 467 U.S. 407, 425, 104 S.Ct. 2489, 2498–99, 81 L.Ed.2d 321 (1984). It follows that if petitioner cannot prove at least a well-founded fear of persecution, he is precluded from qualifying for either asylum or withholding of deportation. *See Castaneda v. INS,* 23 F.3d 1576, 1578 (10th Cir.1994). Our discussion will therefore concentrate on the BIA's finding that petitioner has not proved a well-founded fear of persecution, and is not eligible for asylum.

■ The petitioner has the burden of proving that he is a refugee as defined in 8 U.S.C. § 1101(a)(42). *See Baka,* 963 F.2d at 1378; 8 C.F.R. § 208.13(a). "We review the [BIA's] findings to determine whether reasonable, substantial and probative evidence supports them and may reverse only if petitioner presents evidence that compels the conclusion he has a well-founded fear of persecution based on a statutory factor." *Sadeghi v. INS,* 40 F.3d 1139, 1142 (10th Cir.1994) (citing *INS v. Elias–Zacarias,* 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 815 & n. 1, 117 L.Ed.2d 38 (1992)). We review conclusions of law de novo, although we defer to the BIA's reasonable interpretations of ambiguous statutory provisions. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Kapcia,* 944 F.2d at 705.

■ We next move to petitioner's substantive claims. Petitioner argues that the BIA applied the wrong standard for determining asylum eligibility, and that he met the correct standard. We reject both contentions. The BIA applied the correct standard for determining asylum eligibility, and substantial evidence supports the BIA's denial of asylum.

After reviewing the facts, the BIA concluded that petitioner failed to establish that he has a well-founded fear of persecution. In reaching this conclusion, the BIA noted that despite petitioner's claimed opposition to Khomeini and his role in putting down the 1963 rebellion, he was able to remain in the military following the Khomeini takeover in 1979, was able to retire from the military in 1986, and received military retirement pay. The BIA also considered the fact that petitioner's life was never threatened while in Iran, his status in the military remained unchanged under the new regime, and he was allowed to travel abroad.

Petitioner takes issue with the BIA's factual findings, arguing that the BIA failed to consider certain material facts and misinterpreted others. Petitioner argues that the BIA ignored testimony showing that petitioner's life was threatened for sheltering a cousin who was on the run from authorities. The record shows, however, that authorities made only general threats, none of which were directed specifically at petitioner.

Petitioner also minimizes the BIA's finding that petitioner's military status remained unchanged after Khomeini took power. He points to his affidavit filed in connection with the asylum application in which he alleges that his "actual position in the army became less and less important." Even assuming that petitioner's role in the military was somehow diminished under the new regime, the facts show that he did not lose his rank nor did he suffer any reprisals for having served in the military while the Shah had been in power. In fact, petitioner was promoted to full colonel two years before his retirement. The BIA accurately assessed the factual evidence and drew proper inferences from it.

■ Petitioner challenges the weight given by the BIA to the fact that he was able to obtain a passport and leave the country. Petitioner asserts that he obtained the passport through friends at the passport office and could only do so by omitting any mention of

his military status. Even assuming that petitioner would not have been allowed to leave the country through regular channels, such a restriction would not constitute persecution. *See Abedini v. INS,* 971 F.2d 188, 191 (9th Cir.1992) (not persecution for country to restrict travel abroad). In addition, there is no evidence that petitioner would be punished in any way upon his return to Iran for the method he used to obtain the passport or that any possible punishment for this activity would constitute political persecution.

Petitioner identifies other facts which he alleges the BIA failed to consider: his ongoing contact with Major Abbassi, the fact that Iranian authorities have questioned petitioner's wife in an attempt to learn his whereabouts, and the testimony of Arshin Shariati who supplied information at the hearing regarding petitioner's political beliefs and anti-government political activities.[2] These facts, however, do not show that the Iranian government is aware of petitioner's political beliefs. Nothing in the record indicates that the government knows about petitioner's continuing relationship with Abbassi. Petitioner testified that authorities had asked his wife about his whereabouts, but there is no evidence that the authorities intended to take any action against petitioner because he had gone to the United States. Other evidence before the BIA indicated that Iranians are generally able to return to Iran after long periods abroad without suffering reprisal unless they had close ties to the Shah's regime. There is no evidence that the current government would consider petitioner to have been closely allied with the old regime. In addition, there is no evidence that Iranians have been persecuted for having lived in the United States. Finally, the testimony of Afshin Shariati does not supply any specific information that would show the Iranian government is aware of petitioner's political beliefs or would take any adverse action against him if he returned to Iran.

While we do not doubt the sincerity of petitioner's subjective beliefs, we find that substantial evidence supports the BIA's finding that he failed to provide direct and specific evidence of facts that would support a reasonable fear that he faces persecution on account of any of the grounds enumerated in the Immigration and Nationality Act.

Petitioner also argues that the BIA failed to apply the correct legal standards. First, petitioner alleges that the BIA premised its denial of asylum on petitioner's failure to prove past persecution. To establish refugee status, an applicant must present specific facts showing either past persecution *or* a genuine and reasonable fear of future persecution. *Kapcia,* 944 F.2d at 706. Nothing in the its decision indicates that the BIA required a showing of past persecution. The BIA did note that petitioner had not been persecuted in the past, but this is an indispensable step in the adjudicatory process because "[e]ligibility for asylum can be based on the grounds of past persecution alone even though there is 'no reasonable likelihood of present persecution.'" *Baka,* 963 F.2d at 1379 (quoting *Rivera–Cruz v. INS,* 948 F.2d 962, 969 (5th Cir.1991)). In addition, petitioner's experiences before he left Iran are certainly relevant to determining whether a well-founded fear of future persecution exists. We conclude that the BIA made no error in identifying and applying the correct legal standard regarding past persecution.

Petitioner also contends that the BIA incorrectly required that petitioner show he would be "singled out" for persecution. Regulations provide that the "Immigration Judge shall not require the applicant to provide evidence that he would be singled out individually for persecution" if he establishes his inclusion in and identification with "similarly situated" groups of persons against which there is a "pattern or practice" of persecution in his country on account of any of the five

---

**2.** These facts are not specifically mentioned in the BIA's decision, but the BIA is not required to discuss every piece of evidence when it renders a decision. Although the BIA is required to provide more than just "conclusory statements, all that is necessary is a decision that sets out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided." *Becerra–Jimenez v. INS,* 829 F.2d 996, 1000 (10th Cir.1987) (quoting *Osuchukwu v. INS,* 744 F.2d 1136, 1143 (5th Cir.1984)).

statutory grounds for asylum. 8 C.F.R. § 208.13(b)(2)(i).[3]

■ Petitioner contends that the BIA decision ignores evidence demonstrating that others similarly situated to petitioner have been persecuted by the Iranian government. Petitioner cites as examples that certain military officers who served under the Shah were killed when Khomeini took power, that Major Abbassi's brother was arrested, and that petitioner's cousins were arrested. There is, however, no evidence to establish that petitioner is similarly situated to these individuals. While petitioner was a military officer under the Shah, the evidence does not show that he was closely associated with the Shah, and the Khomeini regime apparently never questioned petitioner's military service. Likewise, there is no evidence that the Iranian government is aware of petitioner's relationship with Major Abbassi or petitioner's anti-government beliefs. As a result, his situation is not comparable to Major Abbassi's brother or to petitioner's cousins.

We find that the BIA correctly identified and applied the standard for well-founded fear of persecution.[4]

## B. Due Process

■ Petitioner asserts that the BIA and IJ violated his procedural due process rights by relying on an inaccurate translation during the deportation proceedings.[5] On the facts of this case, we conclude that the translation provided at the deportation hearing did not violate petitioner's right to due process.

"[W]hile there is no constitutional right to political asylum itself, noncitizens ... are entitled to due process when threatened with deportation. The fundamental requirement

of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *de la Llana–Castellon v. INS,* 16 F.3d 1093, 1096 (10th Cir.1994) (internal quotations and citations omitted). Specifically, "due process requires that the respondent in a deportation hearing ... have an opportunity to be heard, to cross-examine witnesses against him, and to produce evidence ... and that the decision be supported by substantial evidence." *United States v. Gasca–Kraft,* 522 F.2d 149, 152 (9th Cir.1975); *see also* 8 U.S.C. § 1252(b). INS regulations also contemplate that proceedings and documents in a foreign language will be accurately translated. *See* 8 C.F.R. § 242.12 ("Any person acting as interpreter ... shall be sworn to interpret and translate accurately."); *id.* § 103.2(b)(3) ("Any document containing foreign language ... shall be accompanied by a full English language translation which the translator has certified as complete and accurate.").

On September 18, 1989, the IJ continued petitioner's deportation hearing because no Farsi interpreter was available. At that time the IJ asked petitioner how much English he understood and the petitioner responded, "More than fifty percent." The IJ continued the hearing to September 25, 1989, when a Farsi interpreter could be present.

The interpreter used at the deportation hearing stated that she had spoken English for 20 years and Farsi for 38 years. Petitioner's attorney was given an opportunity to voir dire the interpreter and made no objection. The interpreter stated that she was unfamiliar with military terminology and at one point during the hearing said to the IJ: "Don't ask me anything about army. I don't know." In response to counsel's question to petitioner regarding his opposition to the

---

3. Technically, this regulation is inapplicable to petitioner's claim because it applies only to applications filed on or after October 1, 1990. *See* 55 Fed.Reg. 30,680 (July 27, 1990); 8 C.F.R. § 208.1(a). Petitioner applied for asylum on September 23, 1988.

4. Because we conclude that petitioner does not qualify for asylum, it necessarily follows that he does not meet the higher standard required to be eligible for withholding of deportation. *See Kapcia,* 944 F.2d at 702.

5. Petitioner also alleges a due process violation based on his argument that the BIA failed to consider all relevant facts. As outlined in the preceding section of this opinion, we find that the BIA's decision was supported by substantial evidence and that the BIA properly considered the evidence presented. Based on this finding, we hold that petitioner's due process argument must fail.

current Iranian government, the interpreter stated: "I don't know how to say it." Petitioner's attorney restated the question, asking whether petitioner was opposed to the current government, to which petitioner responded through the interpreter: "Definitely, hundred percent." Petitioner has identified other problems with the translation primarily during the examination of petitioner.[6]

While the transcript of the hearing indicates that the interpreter's translation was often less than perfect, there is no indication that petitioner was unfairly prejudiced or prevented from presenting his case. In many cases, when petitioner's answers were unclear, his attorney asked follow-up questions which elicited clarifying responses. In addition, petitioner's attorney made no objections during the hearing to any of the interpreter's translations. We conclude that petitioner was given a fair opportunity to present his case and his evidence to the IJ during the deportation hearing.

In his reply brief, petitioner argues, apparently for the first time, that his due process rights must be evaluated in the context of an *asylum* hearing rather than a *deportation*

proceeding. Petitioner, however, cites no authority for the proposition that one seeking asylum has greater due process protections than one merely seeking to avoid deportation. In fact, this was a deportation hearing at which petitioner was seeking to qualify for asylum. There is no distinction as far as due process protections are concerned.

For these reasons, we find that petitioner's due process rights have not been violated.

### III. Conclusion

We find that the BIA applied the correct legal standards in denying petitioner's application for asylum and that substantial evidence supports its decision. We further conclude that petitioner's due process rights were not violated by the quality of the translation provided during the deportation hearing.

The order of the Board of Immigration Appeals is AFFIRMED.

---

6. Following are some examples of difficulties with the translation cited by petitioner:

Q. So in 1963 you were the leader of a tank squad that helped fight off the Khomeini revolution, is that correct?

A. We were .. we were under cover .. we were working in areas like Bazaar (phonetic sp.) and all the south part of Tehran that it was the start of all these revolution. We were trying to control people there. Lots of people they were in white clothes; that they usually bury them in those things.

Admin. Rec. at 49.

Q. So in the eyes of the Iranian government you have some obligation since you know where he is to carry out the death sentence, correct?

A. Yes, I could do .. yes, I .. they .. they feel I can do that.

Admin. Rec. at 53.

Q. Do you know if any other Iranians in Iran know where Major Abbassi is?

A. I don't thing so, but because one of the friend named Audrey, wanted his address and I told his brother .. Shahin wanted to get the address for Audrey and I asked one of my brother to get the address of Audrey from one of his relatives that is a marriage type of .. and in the code, I kind of let my brother know that I wanted the address for Shahin, but they never answered.

. . .

Q. And did you have to pay somebody to give you a passport?

A. I made .. I played friends .. friendship games and .. and they then paid some money to get the passport.

Admin. Rec. at 55.

Q. Why don't you think anything happened to you before you left Iran?

A. It was just enough that my idiot uncle might have just go and say it to somebody or some of those people that I worked in that day that they converted to this government could have just .. and most of all the .. like ninety-eight percent of all people that they were arrested and killed were .. should I finish .. were .. were the people that they've been told by their inferior officer in the lower officer.

Admin. Rec. at 58.

Q. So the major reasons that you fear a return are your contacts with Shahin, your military career and the fact that you've been in the United States this long?

A. Yes, I was in the army and I was a pilot. Because my brother became American citizen and for a country that they .. they .. the country .. the government who thinks you that United States is their enemy, they don't like any Persians because American.

Admin. Rec. at 61.