**Valentin REGNEANTU, Petitioner,**

v.

**John ASHCROFT and Immigration and Naturalization Service, Respondents.**

No. 99–3154.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 2000.

Decided March 29, 2001.

Before Hon. FRANK H. EASTERBROOK, Hon. MICHAEL S. KANNE, Hon. ANN CLAIRE WILLIAMS, Circuit Judges.

### ORDER

Valentin Regneantu, a native and citizen of Romania, entered the United States on a visitor's visa in March 1992. After his visa expired, the Immigration and Naturalization Service (INS) moved to deport him. In deportation proceedings, Regneantu conceded deportability, but in an effort to remain in the United States he filed an application for asylum and withholding of deportation under sections 208 and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1253(h). Following a hearing, the immigration judge ("IJ") denied Regneantu's application for asylum and withholding of deportation. The Board of Immigration Appeals (BIA) affirmed the IJ's decision and this petition for review followed. For the reasons stated herein, we deny the petition for review and affirm the decision of the BIA.

### I

At the administrative hearing, Regneantu was the only person to testify in support of his asylum application. He testified that he fears returning to Romania because when he lived there he was discriminated against because he is Baptist. He further stated that he was "mistreated" when he served in the Romanian army because he "would not abandon [his] belief in democracy" and because he had relatives living in the United States. He asserted that during the 1989 overthrow of Romania's communist government (headed by Nicolae Ceaucescu), two high ranking communist officials, now in their sixties, threatened to take revenge on him because of his refusal to release them from detention while he (and other military personnel) guarded them. He claimed that based on these threats he would suffer persecution if he returned to Romania. Moreover, according to his testimony, the Romanian police could not protect him because former communist party members continue to control the Romanian police. He further stated that he began receiving threatening telephone calls before he left Romania and that his parents have told him that the calls continue. On cross-examination, however, Regneantu admitted that he has had no contact with the two former communist officials or anybody acting on their authority since his encounter with them in 1989. Regneantu further testified that his parents, who are also Baptists, still work and live in Romania, along with other relatives.

In addition to Regneantu's testimony, the record contained supplemental material regarding post-revolution conditions in Romania, including U.S. State Department Human Rights Practices Reports, and an advisory opinion from Roger Dankert, Director of the State Department Office of Asylum Affairs, Bureau of Human Rights and Humanitarian Affairs. This material reported, among other things, social and political changes in Romania since the 1989 overthrow of the communist government.

Notably, civil liberties, including freedom of speech, press, assembly, association, and religion, are now protected in Romania.

Based on the record, the IJ first concluded that Regneantu failed to establish that he had been persecuted in Romania. The IJ noted that Regneantu was not forbidden to attend religious services while in Romania. Regneantu was never arrested or prosecuted for any offense and he was able to depart Romania for the United States without apparent difficulty. In spite of his religious beliefs, Regneantu was also able to maintain gainful employment in Romania. Thus, the IJ concluded that Regneantu's complaint of past discriminatory treatment did not constitute persecution.

The IJ then went on to find that Regneantu did not establish a well-founded fear of future persecution in Romania. The IJ determined that Regneantu's fears of possible retribution from the two former communist officials were "too speculative." He found that Regneantu encountered no harm during the two year period between his discharge from the military and his departure from Romania. The IJ further noted that Regneantu failed to sufficiently identify the source or content of the alleged telephonic threats. Moreover, it appeared that Regneantu's parents continued to reside and work in Romania without recriminations.

On appeal, the BIA adopted and affirmed the IJ's decision, concluding that Regneantu did not establish past persecution or a well-founded fear of future persecution in Romania. Regneantu now petitions for judicial review, claiming that the BIA's decision is unsupported by substantial evidence in the record.

## II

■ We will uphold the BIA's decision if there is reasonable, substantial, and probative evidence to support the decision based on the record as a whole. 8 U.S.C. § 1105a(a)(4); *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The decision can be reversed only if the evidence compels a contrary conclusion. *Elias–Zacarias,* 502 U.S. at 481. Where, as here, the BIA adopts the reasoning of the IJ's decision, we review the IJ's decision for substantial evidence.[1] *Dobrican v. INS,* 77 F.3d 164, 167 (7th Cir.1996)(internal citations omitted).

■ In order to be considered for asylum in the United States, Regneantu must demonstrate that he is a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is any person outside his native country who is "unable or unwilling" to return to that country because of "persecution or well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish eligibility for asylum, Regneantu must demonstrate a subjective fear of persecution and the objective reasonableness of that fear. *Mousa v. INS,* 223 F.3d 425, 429 (7th Cir.2000); *Bhatt v. Reno,* 172 F.3d 978, 981 (7th Cir.1999); *Sanon v. INS,* 52 F.3d 648, 651 (7th Cir.1995). In satisfying the objective component, Regneantu must show "specific, detailed facts supporting the reasonableness of [his] fear that [he] will be singled out for persecution" in Romania. *Bhatt,* 172 F.3d at 982 (citations omitted). Here, the BIA found that Regneantu failed to meet his burden of proving he is a refugee.

---

1. Because we treat the IJ's reasoning as if it were the opinion of the BIA, we use "IJ" and "BIA" interchangeably.

### A. Well–Founded Fear of Persecution

■ Regneantu contends that the BIA lacked substantial evidence to support its finding that he did not possess a well-founded fear of future persecution in Romania. Regneantu, however, did not establish the reasonableness of his alleged fear with specific, detailed facts. We agree with the BIA that Regneantu's fear of future persecution was unsubstantiated and "too speculative." For example, Regneantu testified that, in 1989, two former communist officials threatened him (and other soldiers), but the record demonstrates that there has been no contact between him and those officials or anybody acting on their authority since that time.[2] Although Regneantu complained of receiving threatening telephone calls, the record also reasonably supports the BIA's finding that Regneantu failed to identify the source or content of those calls. Indeed, he testified that the calls were anonymous. And his testimony did not adequately build an inference that the two former communist officials (or their associates) were responsible for the calls. The record further indicates that Regneantu was never arrested or prosecuted in Romania and that he was able to leave the country without difficulty. Moreover, there is no evidence that his family members have been harmed while he has resided in the United States. The absence of such evidence undermines his claim to have a well-founded fear of persecution. See *Sofinet v. INS*, 196 F.3d 742, 747 (7th Cir.1999); *Bhatt*, 172 F.3d at 982. Thus, based on the record, the BIA did not err in finding that Regneantu failed to prove that he has a well-founded fear of persecution in Romania.

### B. Past Persecution

■ Regneantu also contends that the BIA lacked substantial evidence to find that he did not suffer past persecution on the basis of being a Baptist in Romania. In order to demonstrate that he has compelling reasons not to return to Romania, Regneantu must establish "particularly heinous" past persecution. *Sofinet*, 196 F.3d at 747 (citations omitted). Although Regneantu testified that he was mistreated on the job and not given raises or bonuses, he was able to attend religious services and maintain gainful employment under the former communist government. We agree with the BIA that the alleged discriminatory treatment did not rise to the level of persecution. *See Ambati v. Reno*, 233 F.3d 1054, 1059 (7th Cir.2000). *See also Sharif v. INS*, 87 F.3d 932, 935 (7th Cir.1996) (noting that "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional"). Regneantu has shown, at most, mild harassment, which does not the meet the standard for persecution. Therefore, we agree with the

---

2. Regneantu maintains that the BIA misconstrued the law in requiring him to show that the 1993 prison release of the two former communist officials was certain to result in harm to him. The record, however, indicates that the BIA did not impose such a requirement on Regneantu. In affirming the IJ, the BIA concluded, in its own opinion, that the release of the two former communist officials did not necessarily compel the conclusion that Regneantu possessed a well-founded fear of future persecution. The BIA opined:

> We cannot agree with [Regneantu], as he argues on appeal, that the 1993 release of the two former Ceausescu-government officials whom he arrested and guarded in 1989, which facilitated their conviction on charges of genocide, necessarily leads to the conclusion that he is in danger of future harm from them.

This assessment is consistent with the law since an alien must not only establish a subjectively genuine fear, but the objective reasonableness of that fear. *Bhatt*, 172 F.3d at 981; *Najafi v. INS*, 104 F.3d 943, 946 (7th Cir.1997).

BIA that Regneantu did not establish past persecution in Romania.

## C. Due Process Challenge

Regneantu finally contends that his due process rights were violated when the BIA (1) "ignored" evidence regarding the 1993 prison release of the two former communist officials and (2) waited six years to decide his appeal. While the Fifth Amendment guaranty to due process applies to aliens in deportation proceedings, see *Podio v. INS*, 153 F.3d 506, 509 (7th Cir.1998), Regneantu's due process challenges are without merit. There is no constitutional (or, for that matter, statutory or administrative) rule requiring the BIA to discuss every piece of evidence in the record when it renders its decision. *Groza v. INS*, 30 F.3d 814, 820 (7th Cir. 1994). *See also Abdel–Masieh v. INS*, 73 F.3d 579, 585 (5th Cir.1996); *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995); *Hadjimehdigholi v. INS*, 49 F.3d 642, 648 (10th Cir.1995). We have no reason to doubt that the IJ and BIA reviewed all relevant evidence in the record. *Man v. INS*, 69 F.3d 835, 838 (7th Cir.1995) ("[A]bsent evidence to the contrary, we assume that the BIA reviewed the specific findings of the immigration judge in light of the record . . . ."). Indeed, the IJ specifically noted Regneantu's concern over the prison release of the two former communist officials before characterizing Regneantu's fears as "too speculative."[3]

As for Regneantu's argument that he should not be "penalized" because the BIA "sat on his appeal for six years." Regneantu apparently perceives some penalty because of the social and political change which has occurred in Romania during the pendency of his appeal before the BIA. While we are not comfortable with the time delay, Regneantu has shown no due process violation. Recently, in an asylum case involving a six-year delay in the BIA's decision, Romanian aliens argued that the BIA's decision was based on "outdated information," yet they made no attempt to introduce new information. *Dobrota v. INS*, 195 F.3d 970, 972 (7th Cir.2000). After taking judicial notice of the U.S. State Department's then most recent Romania Country Report (1998), which characterized Romania as a constitutional democracy, the court found that the Romanian aliens failed to establish a well-founded fear of future persecution in Romania. *Id. See also Roman v. INS*, 233 F.3d 1027, 1033 (7th Cir.2000). Regneantu summarily contends that his case is "substantially different" from *Dobrota*, but we perceive little or no difference between Regneantu's circumstances and those of his fellow countrymen in *Dobrota*. Thus, we reject his due process challenge.

Inasmuch as Regneantu has failed to establish his eligibility for asylum, he necessarily has failed to meet the more stringent requirements for withholding of deportation. *Boykov v. INS*, 109 F.3d 413, 418 (7th Cir.1997); *Dobrican*, 77 F.3d at 168. Accordingly, the BIA's decision, which is supported by substantial evidence in the record, must stand.

## III

On the basis of the foregoing, we DENY the petition for review and AFFIRM the decision of the BIA.

---

**3.** Regneantu argues that the BIA also ignored a letter from Daniel Prunaru, who reported that he was beaten in Romania when he alleged that he was "Romanian–American."

Regneantu fails to explain the relevance, if any, this letter has on his asylum claim. The BIA was not required to mention explicitly this evidence in any event.