**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 27, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JORGE ALBERTO BONILLA-
ESPINOZA,

Petitioner,

v.                                                                      No. 24-9566

PAMELA J. BONDI[*], United States
Attorney General,

Respondent.

------------------------------

TIMOTHY ADAM GOLOB, Ph.D.,

Amicus Curiae.
_____

**Petition for Review from the**
**Board of Immigration Appeals**
_____

Brendan E. Ryan (Devika M. Balaram with him on the briefs), Kirkland & Ellis LLP, Chicago, Illinois, for Petitioner.

Gregory M. Kelch (Sarah K. Pergolizzi, Yaakov M. Roth, and Leslie McKay on the briefs), Office of Immigration Litigation Civil Division, U.S. Department of Justice, Washington, D.C., for Respondent.

Benjamin G. Shatz, Manatt, Phelps & Phillips, LLP, Los Angeles, California, filed an amicus curiae brief for Timothy Adam Golob, Ph.D. in support of Petitioner.

_____

[*] On February 5, 2025, Pamela J. Bondi became Attorney General of the United States. She has been substituted for Merrick B. Garland as Respondent, per Fed. R. App. P. 43(c)(2).

———————————————————————

Before **HARTZ**, **BACHARACH**, and **CARSON**, Circuit Judges.

———————————————————————

**HARTZ**, Circuit Judge.

———————————————————————

Jorge Alberto Bonilla-Espinoza (Petitioner) is a native and citizen of El Salvador. An immigration judge (IJ) denied him asylum, withholding of removal, and relief under the Convention Against Torture (CAT), and the Board of Immigration Appeals (BIA) affirmed. Petitioner challenges the BIA's denials of relief and also claims that the IJ denied him a fair hearing. We deny the petition for review. The BIA did not err in ruling that Petitioner failed to show that he had been persecuted because of a protected ground, that he had been subjected to past abuse that rises to the level of torture under the CAT, or that he is more likely than not to be singled out for torture if returned to his home country. And Petitioner was not denied due process in his hearing.

## I.    BACKGROUND

Petitioner arrived in the United States near El Paso, Texas, on February 7, 2023, without proper documentation. After being served with a notice to appear by the Department of Homeland Security, he admitted removability but timely filed a pro se application for asylum, withholding of removal, and relief under the CAT. Petitioner submitted a declaration in support of his application, and a hearing was conducted before the IJ on April 9, 2024. He gave the following account:

2

In 2017 Petitioner was charged in El Salvador with associating with "illicit groups" and detained for the next nine months without contact with the outside world. He was placed in a cell (or dormitory) with 70 other detainees, where he was forced to wear only his underwear and sleep on a metal bed with no mattress, leaving a scar on his hip. Eventually, a Salvadoran judge found him innocent and ordered him released. Petitioner testified that the police and prison guards beat him during his detention, which prompted the IJ to ask several follow-up questions.[1] In response, Petitioner offered no specifics about these beatings.

Between 2018 and 2021, the police stopped and beat Petitioner approximately seven times, but he was not incarcerated on those occasions. Then, in September 2021 police stopped him on the street and asked him for information about criminal activity in his neighborhood. When he offered no help, the police beat him once again. They continued until Petitioner's mother arrived at the scene and told them to stop, at which point they took him to a police station. He was detained for six days, during which he was beaten and forced to exercise. Once again, the IJ noted that

---

[1] "But what did they do? You said they beat you. Could you explain?" A.R. at 129.

   "Sir, when you say the police detained you and beat you, can you describe that incident?" *Id.*

   "And when did they beat you?" *Id.* at 130.

   "Is there any other detail you would like to provide the court about this arrest?" *Id.*

despite her request for specifics, Petitioner "never really explained what they did, how they beat [him]." A.R. at 143.[2]

After this second detention, El Salvador declared a "state of exception" empowering security forces to arrest anyone suspected of belonging to or supporting a gang.[3] According to the United States Department of State 2022 Human Rights Report for El Salvador, the state of exception "suspended the rights to be informed immediately of the reason for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association." *Id*. at 663. The document also stated that there had been credible reports of increased human-rights abuses, including unlawful or arbitrary killings, forced disappearances, torture, cruel and degrading treatment by security forces, life-threatening prison conditions, threats to judicial independence, restrictions on free expression and media, and government corruption.

Operating under the state of exception, Salvadoran police came to Petitioner's neighborhood in December 2022 and rounded up about 20 men, including Petitioner,

---

[2] The IJ asked: "I mean, did they knock you unconscious? Did they break your nose? Did they break your arm? Or did they just slap you around? I have no idea. You haven't really offered any details." *Id.* at 143–44.

Petitioner responded that the police "only, like, hit me in the stomach, and then I couldn't, like, get enough air." *Id*. at 144.

[3] An amicus brief filed by Dr. Timothy Golob submitted further information on country conditions. But we must confine our review to the evidence in the record. *See* 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based"); *Ritonga v. Holder*, 633 F.3d 971, 977 n.3 (10th Cir. 2011) (where a report on country conditions "was not included in the record, we decline to consider it in our decisionmaking").

for detention. All were accused of collaborating with illicit groups. During this third detention, which lasted 15 days, police beat Petitioner on the sides of his head. This was the only beating that prompted Petitioner to visit a doctor, who diagnosed him with ear trauma. The police also forced Petitioner to exercise nude.

Shortly after Petitioner's third detention, police interrogated his mother at her place of work about an anonymous tip that she collaborated with gangs. Petitioner's two sisters hurried to their mother's side, and the police detained all three women on suspicion of collaborating with illicit groups. As of the date of his declaration, Petitioner had heard nothing further about their case. In January 2023, within a month of his family's detention, Petitioner fled El Salvador.

When the IJ asked Petitioner why his application for relief checked off "political opinion" as a basis for asylum, Petitioner responded that he and his mother had always opposed the government oppression. *Id*. at 121. His mother belonged to the Fundación de Estudios para la Aplicación del Derecho (the Foundation for Studies for the Applications of Rights, or FESPAD), an organization that seeks to prevent violence and promote the rule of law. She joined FESPAD around 2018 and later participated in a FESPAD symposium on human rights. Petitioner accompanied his mother to FESPAD meetings, where she would help distribute pamphlets. He did not speak at these meetings or engage in organizational work. Petitioner's declaration asserted that the police "did not like" that his mother belonged to FESPAD and that she "always told the police to behave . . . and to respect people's rights." *Id*. at 211. On one occasion before she was arrested, his mother texted a friend that the police

5

threatened to "take" her and her daughters if she did not tell them "where the guys were hidden" but "I told them I knew my rights but they didn't like that [and] they were mad." *Id*. at 304.

Other evidence in the record raised questions about the connection between Petitioner's persecution and the political opinions of his family. Petitioner's first detention began in 2017, before his mother joined FESPAD. Also, he testified that he did not engage in political activity other than attending FESPAD meetings. And he repeatedly provided a nonpolitical motive for his mistreatment. He testified that the police generally assumed that young people from Petitioner's neighborhood belonged to gangs. Officers routinely stopped members of his community, particularly young men.[4] And Petitioner testified several times that the purpose stated by the police in

---

[4] "Q: [T]hat sounds like they do that to everybody?
    A: Well, they always try. Like, even if you don't look suspicious, but if you are young, if you look young, they would stop you." A.R. at 135.

    "Q: So am I hearing that right, that . . . they would approach many young people randomly and stop them?
     A: Yes, your honor." *Id.*

    "Q: Okay. But my point is you weren't the only person being stopped, right? They were stopping a lot of young people. If somebody looks young, they would stop you.
     A: Yes, I have friends that they would suffer of the same thing." *Id.*

    "Q: So you were not the only one they were targeting.
     A: No. There are several people who are going through the same situation." *Id.* at 139.

detaining him was that they suspected him of gang involvement (not a political activity).[5]

At the conclusion of the hearing the IJ issued an oral decision denying Petitioner the requested relief. In her written opinion, although the IJ found "somewhat frustrating" Petitioner's tendency to avoid answering questions, to provide information that was not requested, and to leave details out of his testimony, she ultimately did not find that he was not credible. *Id.* at 26. But on the merits she held that Petitioner failed to establish a nexus between past or future harm and a protected ground. The IJ found that Petitioner presented no evidence that "he has a political opinion," that "anyone would know what his political opinion is," that his mother engaged in political activity that was "publicly known," or that she made herself "a visible target." *Id.* at 28. Even assuming that he had a political opinion, Petitioner "consistently testified" that the police claimed to suspect that he and his family had information about gangs in his area. *Id.* at 28–29. The IJ concluded that

---

[5] Regarding his first detention in 2017, the police "only told me that I was going to be detained because I was collaborating with these illicit groups." A.R. at 130.

"They would stop me, they would beat me, always speculating that I would belong to . . . a group." *Id.* at 137.

"Q: So, they singled you out because they thought you were part of [the gang] MS. Is that right?
    A: Yes, your honor." *Id.* at 138.

"Q: Did they beat you because you were not giving them the information that they requested?
    A: Yes, always has been because they want information." *Id.* at 141.

"police or government officials' belief that somebody is a gang member or in any way affiliated with a gang member" is "just not a protected ground." *Id*. at 29.

The IJ also determined that Petitioner presented no evidence that he had been targeted on account of membership in a particular social group. The IJ's decision notes that she asked many times what commonality Petitioner shared with other people the police were targeting, and he consistently testified that police suspected nearly everyone, particularly youth and residents of his neighborhood, of being affiliated with gangs.

The IJ next held that Petitioner was not entitled to relief under the CAT. She determined that the "most salient elements of mistreatment that [Petitioner] could come up with" were "sleeping on an iron bed without a mattress" and "being forced to wear [only] underwear," which she did not think rose to the level of torture. *Id*. at 32. As to the likelihood of future torture, the IJ reasoned that El Salvador's "overzealous" actions did not necessarily mean that Petitioner in particular would be singled out and tortured upon return. *Id*. at 33. The IJ also noted that Petitioner repeatedly emphasized that he lived in a "unique" neighborhood, where gangs are especially powerful and the police are particularly suspicious of young men. *Id*. at 34. Since his family's ties to that area are mostly based on real property, she suggested that relocation within El Salvador "could be a possibility." *Id*.

On April 18, 2024, Petitioner, again acting pro se, submitted a Form EOIR-26 "Notice of Appeal from a Decision of an Immigration Judge." Petitioner's stated reasons for appeal, which he handwrote onto the form, were as follows:

> The reason I am appealing this is because the judge told me not to fear persecution, but I am scared to go back to my country because I will be incarcerated without no legal reason. they have already done this, not only was I incarcerated for no legal reason but I was also tortured and thats why I fled El Salvador as soon as I was released. My mom and my sisters are sitting in jail in el salvador as I write this to you. I feel like my evidence that I provided was not taken serious. My family and I have had our human rights violated in our country so im begging you, your honor please take my cry for help and rereview my case. I couldn't freely express myself in court cause the lack of language.
>
> Respondent reserves the right to raise additional arguments upon receip of transcript.

*Id.* at 19.

Petitioner's Form EOIR-26 also announced his intent to file a separate written brief or statement after the notice of appeal. He received a notice that such a brief would be due on June 4, 2024. But Petitioner's next filing was a request for an extension to file his brief, received by the BIA on June 17. The BIA denied this request, which should have been submitted before the due date for the brief. When Petitioner submitted a brief a week later, the BIA rejected it as untimely.

On July 31, 2024, the BIA affirmed the IJ's decision. The BIA agreed with the IJ that Petitioner had not met his burden of proving his eligibility for asylum or withholding of removal because he failed to show a nexus between his political opinion or membership in a particular social group and Salvadoran police persecution. The BIA also agreed that Petitioner was not eligible for relief under the CAT because he failed to show that he was more likely than not to be tortured upon his return to El Salvador. Finally, the BIA rejected Petitioner's claim that he was

denied a fair hearing, reasoning that Petitioner had not shown that the hearing was unfair or that he was prejudiced.

## II.     DISCUSSION

This court reviews the BIA's findings of fact for substantial evidence, *see Dallakoti v. Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010), affirming "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). Though "we limit our review to the grounds relied on by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Orellana-Recinos v. Garland*, 993 F.3d 851, 855 (10th Cir. 2021) (internal quotation marks omitted). We review questions of law de novo. *See Dallakoti*, 619 F.3d at 1267.

### A.     Asylum and Withholding of Removal

To be granted asylum, Petitioner must show that he is "unable or unwilling to return to [El Salvador] 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id*. (quoting 8 U.S.C. § 1101(a)(42)). To be eligible for withholding of removal, an alien must make a quite similar showing but under a higher burden of persuasion—he must "demonstrate that his life or freedom would be threatened in the proposed country of removal because of his race, religion, nationality, membership in a particular social group, or political opinion." *Id*. at 1267–68 (internal quotation marks omitted).

Petitioner challenges the IJ's finding that he failed to establish a nexus between a protected ground and the persecution he suffered. We are not persuaded.

First, Petitioner argues that the police abused him because of his "anti-government political opinion." Pet'r Br. at 23. But there was more than ample reason for the IJ and the BIA to reject that proposition. Despite being asked repeatedly why the police had questioned and harassed him, Petitioner consistently responded that the police routinely stopped young men in his neighborhood. As Petitioner now argues, the explanations by the police for why they were harassing him may have been pretextual. And there was some evidence of political activism by him and his mother. But his mother had a minimal role in community organizing (she was surely no leader), and he was a virtual nonentity in the movement. Although the evidence of Petitioner's persecution is quite troubling, his arguments that it was *political* persecution border on the fanciful. We could hardly say that every "reasonable adjudicator would be compelled to conclude" that the police were motivated by the politics of Petitioner, or even of his mother. 8 U.S.C. § 1252(b)(4)(B). And because the agency could properly find that Petitioner had failed to show that the police were motivated by a protected ground at all, it was not required to engage in a mixed-motive analysis to determine whether that nonexistent motive was "one central reason" for the police persecution of Petitioner. *Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013).

Second, Petitioner contends that he was targeted because he belonged to a particular social group—namely, those with "imputed gang membership." Pet'r Br. at

11

47. One may question whether a group of "imputed gang members" satisfies the requirements that a particular social group share a "common, *immutable* characteristic," *Rivera-Barrientos v. Holder*, 666 F.3d 641, 648 (10th Cir. 2012) (emphasis added), and be perceived by society (not just the police) as a discrete group, *see id*. at 650–51; *Escamilla v. Holder*, 459 F. App'x 776, 787 (10th Cir. 2012) (rejecting a proposed particular social group—"Salvadoran men believed to be gang members of a rival gang"—because the group was defined "not by society's perception of the group, but by the perceptions of the . . . rival gangs" (internal quotation marks omitted)). But we need not resolve that issue because we may address only those issues that have been exhausted by presentation to the BIA. *See* 8 U.S.C. § 1252(d)(1) (granting reviewing-court jurisdiction only if alien has exhausted administrative remedies). Petitioner's notice of appeal to the BIA, which contained his only arguments to the agency, did not dispute the IJ's ruling that "government officials' belief that somebody is a gang member or in any way affiliated with the gang member, that's just not a protected ground." A.R. at 29. Nor did it in any other way suggest to the BIA the applicability of that purported particular social group. Hence, even construing Petitioner's pro se notice of appeal liberally, this issue was not exhausted. *See Awuku-Asare v. Garland*, 991 F.3d 1123, 1125 n.1 (10th Cir. 2021) (a petitioner "must present the *same specific legal theory* to the BIA before he . . . may advance it in court" (internal quotation marks omitted)); *Ribas v. Mukasey*, 545 F.3d 922, 930–31 (10th Cir. 2008) (refusing to consider on the merits an issue that had not been exhausted by presentation to the BIA).

We recognize that the government brief in this court did not argue that Petitioner had failed to exhaust this argument, and a failure-to-exhaust issue is subject to waiver and forfeiture. *See Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1116 (2023). Nevertheless, "forfeiture binds only the party[,] not the court," and "it is well-settled that courts have discretion to raise and decide forfeited issues sua sponte." *Miguel-Pena v. Garland*, 94 F.4th 1145, 1158 (10th Cir. 2024) (brackets and internal quotation marks omitted) (exercising the court's discretion to consider whether an issue was exhausted by petitioner before the BIA, even though the government may have forfeited on appeal a failure-to-exhaust objection), *cert. denied*, 145 S. Ct. 545 (2024). In this case we exercise our discretion to overlook any forfeiture by the government and refuse to address an issue not exhausted before the BIA. Because the imputed-gang-membership issue was not presented to the BIA, it had no occasion to consider the matter and explain why Petitioner had or had not identified a particular social group. *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"); *see also Gonzales v. Thomas*, 547 U.S. 183, 185 (2006) (summarily reversing an appellate court for recognizing a proposed particular social group in the first instance, without prior resolution by the agency). Even if we need not defer to the resolution of the issue by the BIA, we would surely benefit from its analysis. We therefore leave the issue for another day.

13

### B.　Convention Against Torture

Unlike Petitioner's asylum and withholding-of-removal claims, his CAT claim does not require a nexus between the alleged torture and a statutorily protected ground. *See Ritonga v. Holder*, 633 F.3d 971, 978 (10th Cir. 2011). To be eligible for relief under the CAT, it is enough for Petitioner to establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* (internal quotation marks omitted).

Petitioner argues that the IJ erred by ignoring evidence of his past torture, which is probative of the likelihood of torture upon his return. He also disputes the IJ's conclusion that he is unlikely to be subjected to future torture if removed to El Salvador, because the IJ ignored his country-conditions evidence. He contends that the IJ was required by regulation to address that evidence, including El Salvador's state of exception and associated human-rights abuses. *See* 8 C.F.R. § 1208.16(c)(3)(iii)–(iv) (the IJ must consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and other relevant information of country conditions). He also argues that the IJ and BIA required him to show why relocation within El Salvador was impossible, when the correct standard is whether relocation is unreasonable. He claims that the country-conditions evidence shows that internal relocation was not reasonable, rebutting the IJ's conclusion that the level of police corruption and violence in Petitioner's neighborhood was "unique." Pet'r Br. at 57 (internal quotation marks omitted).

We are not persuaded that Petitioner is entitled to relief under the CAT. His testimony lacked sufficient detail to constitute evidence of past torture. Torture is "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment." 8 C.F.R. § 1208.18(a)(2); *see also* § 1208.18(a)(1) (torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person"). Petitioner does not describe abuse rising to this level. To be sure, he was "beaten up on several times," with one assault causing lasting ear damage; forced to wear only his underwear and sleep on a metal bed with no mattress, leaving scars on his hip; and forced to exercise nude. A.R. at 128. But Petitioner provides no legal authority in which abuse similar to what he experienced was considered torture. Indeed, in this circuit we have repeatedly issued unpublished opinions deciding that similar, or even more significant, abuse can be distinguished from torture. *See Singh v. Garland*, No. 22-9563, 2023 WL 3337210, at *4 (10th Cir. May 10, 2023) (unpublished) (upholding the BIA's determination that a petitioner who was beaten with hockey sticks and baseball bats was not tortured); *Nche v. Garland*, No. 20-9621, 2021 WL 4164050, at *1, *3 (10th Cir. Sept. 14, 2021) (unpublished) (petitioner who claimed to have been tortured when he was arrested, beaten, and detained on three occasions did not "overcome the high bar necessary to set aside the BIA's factual findings"); *Bolainez-Vargas v. Garland*, 861 F. App'x 159, 164 (10th Cir. 2021) (petitioner who "stated without further elaboration that the police 'beat [him] up with that black thing that they carry'" was not tortured); *see also Hernandez v. Garland*, 52 F.4th 757, 769 (9th

15

Cir. 2022) (collecting Ninth Circuit cases in which various petitioners alleged beatings causing, among other things, scarring and hearing damage, none of which rose to the level of torture).

Given that Petitioner's specific evidence of the abuse he had experienced over a period of several years did not rise to the level of torture, the IJ and BIA could reasonably find that, despite the country conditions reported by the State Department, it was not more likely than not that Petitioner would suffer torture if returned to El Salvador. We therefore need not address the relocation issue.

## C.    Due Process

Petitioner alleges two ways in which he was deprived of due process of law in his removal proceedings. One way is that the IJ failed to develop the record on his behalf. He claims that even though he checked "political opinion" as a protected ground in his asylum application and described his anticorruption and prodemocracy views, the IJ did not develop his testimony that could show that the illicit-groups justification for his arrests was pretextual and what the true reasons were. Nor, he contends, did she solicit details about his and his mother's political opinions, such as what it meant for them to be against the regime and whether others knew of their opinions, or whether Petitioner belonged to any cognizable particular social groups, such as "son of a neighborhood political activist" or "young man from an impoverished community who had been incorrectly labeled by the police as being affiliated with gangs." Pet'r Br. at 50–51.

The other due-process violation alleged by Petitioner is that there was poor communication at the hearing. He argues that record evidence, including "the IJ's comments that [Petitioner] had 'difficulty answering court questions,' the comments that she did not understand his testimony, and [Petitioner's] own assertion that he was unable to freely express himself in the merits hearing because of the language barrier," cumulatively show that he was prejudiced by translation problems. Pet'r Reply Br. at 30.

The government contends that Petitioner did not exhaust his due-process arguments before the BIA. Petitioner responds that his notice of appeal stated "that he was unable to freely express himself during his merits hearing cause (sic) the lack of language and that evidence that he provided was not taken serious." *Id.* at 2–3 (brackets and internal quotation marks omitted). Although we are inclined to agree with the government, we need not adopt its position because we can readily dispose of the issues on the merits.

Regarding the alleged failure to develop the record: Contrary to Petitioner's characterization of the hearing, the IJ took pains to try to clear up ambiguities and confusion and to elicit all relevant facts from Petitioner. This circuit has "not explicitly recognized" that "an IJ has an affirmative duty to develop the record when the applicant is not represented," but even if we were to impose such a duty upon the IJ, we would conclude that she fulfilled it. *Matumona v. Barr*, 945 F.3d 1294, 1303–04 (10th Cir. 2019) (assuming for purposes of the appeal that an IJ had a duty to develop the record and concluding that the petitioner could not establish that the IJ's

17

performance of that duty was prejudicially inadequate). For each instance of abuse experienced by Petitioner, the IJ asked him, sometimes multiple times, how he was mistreated and why he thought the police targeted him. She had no duty to come up with potential arguments for Petitioner and then try to elicit information to support them.

We further note that Petitioner has failed to identify any mistranslations that prejudiced him.[6] *See Hadjimehdigholi v. INS*, 49 F.3d 642, 650 (10th Cir. 1995) ("While the transcript of the hearing indicates that the interpreter's translation was often less than perfect, there is no indication that petitioner was unfairly prejudiced or prevented from presenting his case"); *see also Kheireddine v. Gonzales*, 427 F.3d 80, 85 (1st Cir. 2005) (requiring the claimant to "show specific prejudice to his ability to perfect an appeal sufficient to rise to the level of a due process violation" (internal quotation marks omitted)). After virtually every supposed instance of "the IJ and [Petitioner] talking past each other," Pet'r Br. at 59, the IJ asked follow-up questions to clarify Petitioner's testimony.

---

[6] Petitioner argues that identifying specific translation errors would have required reopening the record, though he does not indicate why this would be needed. *Cf. Zorig v. Holder*, 387 F. App'x 865, 867 (10th Cir. 2010) (petitioners alleged due-process violations based on four translation errors found by an interpreter whom they engaged to review the tapes of agency hearings). Instead, Petitioner attempts to show that mistranslations occurred by identifying confusing exchanges in the record. *See Hadjimehdigholi v. INS*, 49 F.3d 642, 649–50 (10th Cir. 1995) (petitioner pointed to an interpreter's statements that she did not know how to translate certain questions and terminology and provided specific examples of questions and nonresponsive answers by the petitioner).

### III.    CONCLUSION

We **DENY** the Petition for Review and **GRANT** Petitioner's request to proceed *in forma pauperis*.