Garri KARAPETIAN, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

Nos. 97–2218, 97–3953.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1998.

Decided Dec. 9, 1998.

David Rubman (argued), Chicago, IL, for Petitioner.

Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL; Bryan S. Beier (argued), United States Department of Justice, Washington, DC, for Respondent.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

█ █ The Board of Immigration Appeals (BIA) is entrusted with wide latitude to determine the fate of those who desire to settle in our country, and its judgments are given great deference by the federal courts. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112

S.Ct. 812, 117 L.Ed.2d 38 (1992). For most foreign nationals, the judgment of the BIA as a practical matter usually amounts to the final word on their hopes for living in the United States, although its decisions are not wholly discretionary for aliens lawfully in this country. Perhaps it is partly due to its tremendous power within this sphere that the BIA is also given more freedom than the federal courts to reconsider judgments after they have been made. Compare *Calderon v. Thompson*, 523 U.S. 538, ——, 118 S.Ct. 1489, 1498, 140 L.Ed.2d 728 (1998), with 8 C.F.R. § 3.2(a). See also *In re Cerna*, 20 I & N Dec. 399, 403, 405–06, 1991 WL 353528 (BIA 1991). This case merits such reconsideration.

Garri Karapetian is an Armenian Baptist who entered the United States from his home country of Georgia (then still a part of the former Soviet Union) in 1991. He feared a return to Georgia, where at that time the Georgian Orthodox Church (which is vocally and perhaps even violently hostile to his minority faith) was supported formally by the State. For this reason, he applied to the Immigration and Naturalization Service (INS) for political asylum soon after his arrival. The fate of the application itself is mysterious, because it is not in the record, but when the INS commenced deportation proceedings against Karapetian on April 28, 1995, for overstaying his original tourist visa, Karapetian conceded his deportability and then requested and was granted an opportunity to file a renewed application for political asylum.

After a hearing before an immigration judge (IJ) on May 7, 1996, however, Karapetian's application for asylum and alternative request for withholding of deportation were denied. The IJ granted him the opportunity voluntarily to depart the United States. Instead, Karapetian appealed to the BIA, which upheld the IJ's decisions in an order of April 23, 1997. On July 22, 1997, represented by new counsel, Karapetian filed a motion to reopen the deportation proceedings so that he could present new evidence demonstrating the continued persecution of Baptists in Georgia. The motion was denied on November 19, 1997. The BIA refused to reopen the proceedings for three reasons: first, it found that the new evidence, a letter from the vice-president of a Christian missionary organization operating in Georgia, was not corroborated; second, it found that the letter was not sufficient to establish changed circumstances; and third, it found that Karapetian had not established that the facts contained in the letter were unavailable at the time of the May 7, 1996, hearing. The BIA accordingly denied Karapetian's motion, and he has appealed to us pursuant to 8 U.S.C. § 1105a(a), applicable here in its pre-Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), form. See 8 U.S.C. § 1101 note ("Effective Date of 1996 Amendments"); *Bereza v. INS*, 115 F.3d 468, 470 n. 2 (7th Cir.1997).

Karapetian was born in the Soviet Republic of Georgia in 1972. He completed high school in Tbilisi in 1989, and began working as a trainee in a jewelry salon in 1990. Karapetian and his family were Evangelical Baptists, a minority religious sect in Georgia. They belonged to a subset of the Baptists that had broken away from the mainstream church in 1989. It seems to have been a tiny splinter group, with at most 300 members by 1996. They met secretly in members' homes, because they feared the consequences— harassment by police and anti-Baptist activists—if they were detected.

According to Karapetian, these fears were realized one Sunday evening in April 1991, at the Tbilisi Baptist Church, the place of worship for mainstream Baptists. He claimed that a group of 75 to 100 armed persons broke into the church and threatened to kill the worshipers if they did not disperse immediately. This incident occurred only a few days after the Georgian Orthodox Patriarch had announced that Orthodoxy was the official Georgian religion. Karapetian recalled that at least five Baptist worshipers were hospitalized as a result of the melee. He himself was not injured, because he was helping women, children, and elderly individuals leave the church. The next day, when he returned to the scene, he found that all of the pews had been damaged, the sound amplification system had been ripped out, and the

front doors of the building were broken off. No one called the police during the incident.

Before the IJ, Pavel Chalikian, Karapetian's half-brother, had a somewhat different recollection of the event, and it was Pavel's account that the IJ chose to credit. According to Pavel, there were ten unwelcome Orthodox Church members inside the Baptist church on the night in question. One of them shouted out, "You are all Satanists!" to the Baptists—a remark that provoked a fight inside the church. Pavel agreed that there were 75 to 100 people outside the church, but he characterized them as passers-by. He also denied that there was any gunfire, and he said that no one among the group of outsiders drew weapons or threatened to kill those inside the church.

In any event, in 1991, Karapetian and Pavel left Georgia together because they were afraid of persecution from anti-Baptist committees that were forming. Shortly after their arrival in the United States, both brothers filed applications for asylum—on the same day, and on the same grounds. They were assigned to different hearing officers, however, with dire consequences for Karapetian. In 1992, Pavel was granted asylum on the basis of fear of religious persecution. We have, as mentioned above, no idea what became of Karapetian's application. On April 30, 1996, Karapetian's mother and grandmother entered the United States under a "humanitarian parole" grant, which allows them lawfully to stay in this country "temporarily" for an open-ended period. See 8 U.S.C. § 1182(d)(5). On the same day, Karapetian's aunt, Natalya Shalikyan, and her immediate family were granted refugee status by the U.S. Department of State and permitted to enter the country. Again, at least for now their stay in the U.S. is open-ended. See 8 U.S.C. § 1157(c).

Thus, alone among his entire immediate and extended family, Karapetian failed to persuade the INS to grant some form of political asylum or refugee status. The inconsistency the agency has shown—issuing diametrically opposed judgments to members of the same family, all of whom sought asylum on the same religious basis, and the same facts—is very troublesome to us, particularly because it will strand Karapetian in a country that is at least unfriendly to his religion, without even the support and help that family can provide. But we do not see where, under the highly deferential standard of review that applies to INS cases, we can take this fact into account, and Karapetian himself has expressly disclaimed any argument that he should prevail solely because other members of his family have managed to secure their positions in the United States. We therefore turn to the arguments he has presented.

■■■ As Karapetian concedes, the Attorney General has broad discretion to grant political asylum to individuals who qualify as "refugees" under 8 U.S.C. § 1101(a)(42)(A). The question whether a person is such a refugee is a factual one, committed in the first instance to the BIA. We review its determinations under a highly deferential version of the substantial evidence test, which requires us to affirm if the Board's decision to deny asylum is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812. We will reject the BIA's findings only if the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at 483–84, 112 S.Ct. 812. We review the Board's decision not to reopen the case for abuse of discretion. See *INS v. Doherty,* 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992).

■■ With respect to the initial decision, we cannot say that the IJ's opinion, which the Board did not disturb and which we therefore review here, was unsupported by substantial evidence. The IJ chose to credit Pavel's account of the April 1991 incident over Karapetian's. Specifically, the IJ found "that the incident which occurred in April of 1991 was a disagreement which grew out of different denominations within the church and a fight ensued. Despite this fact being unfortunate, this incident does not support the respondent's claim for political asylum." The IJ also found that other than the April 1991 incident, the record reflected that Karapetian had never been active politically, he had never been arrested, and he had never

attracted the attention of any governmental units. We are simply not in a position to second-guess those kinds of factual findings and credibility determinations. See, *e.g.*, *Bereza*, 115 F.3d at 473. Although Karapetian presented evidence suggesting that intolerance for Baptists was still a serious problem (perhaps more serious than before) in post-Soviet Georgia, the inevitable and sunnier country report from the State Department indicated that conditions have improved considerably. Since Karapetian left, Georgia has experienced one coup d'état, two secessionist struggles, and one civil war. After former president Gamsakhurdia was ousted from power in January 1992, President Eduard Shevardnadze reinstated fuller religious liberty. According to the U.S. Department of State, from 1993 onward, no discrimination against non-Georgians was "evident," and restraints on publishing Baptist materials and restrictions on proselytizing had been lifted.

We realize that Karapetian offered evidence that painted a far more dismal picture of the situation of Baptists in today's Georgia, but that alone is not enough for us to say that the IJ was required to credit Karapetian's evidence over the information—both testimonial and documentary—upon which it relied. We therefore conclude that Karapetian has not met his burden of showing that the BIA's initial decision affirming the IJ lacked a sufficient evidentiary foundation.

As we noted above, the Board denied the motion to reopen on three separate grounds: lack of corroboration, substantive insufficiency, and failure to show earlier unavailability. Had the Board referred only to the fact that the missionary's letter was uncorroborated, we would be compelled to reverse its decision as an abuse of discretion, because there is no legal requirement that evidence of this kind be corroborated. See *Matter of Dass*, 20 I & N Dec. 120, 124–25, 1989 WL 331876 (BIA 1989); see also *Stankovic v. INS*, 94 F.3d 1117, 1119 (7th Cir. 1996); *Velarde v. INS*, 140 F.3d 1305, 1310 & n. 5 (9th Cir.1998). The latter two grounds, however, fall squarely within the Board's discretion, see *Johnson v. INS*, 962 F.2d 574, 576–77 (7th Cir.1992), and we cannot say that the Board committed an abuse by refusing for those reasons to reopen the case.

Although Karapetian presents an exceptionally sympathetic case, both on its own merits and because of the disturbing inconsistency different units of the INS have imposed upon his family—an inconsistency which should be a serious concern for an adjudicative body, even though not legally dispositive, see *Andershock's Fruitland, Inc. v. U.S. Dep't of Agriculture*, 151 F.3d 735, 738 (7th Cir.1998)—on the law we have no alternative but to uphold the Board's decisions. This would not, of course, preclude the Board from reconsidering or reopening Karapetian's case on its own initiative, see 8 C.F.R. § 3.2(a), or upon a proper motion. See *id.* at § 3.2(c)(3); see also *In re Cerna*, 20 I & N Dec. at 405 ("We note that a principal mission of the Board of Immigration Appeals is to ensure as uniform an interpretation and application of this country's immigration laws as possible.").

The decision of the BIA is hereby AFFIRMED.