Christina **DOBROTA** and Ovidiu Teodorescu, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 99–1343.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 6, 1999.

Decided Nov. 1, 1999.

Rehearing Denied Jan. 6, 2000.

David Rubman (argued), Rubman & Compernolle, Chicago, IL, for Petitioners.

Janet Reno, United States Attorney, Office of the United States Attorney General, Washington, DC, Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Quynh Vu, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, Michael Dougherty (argued), Department of Justice, Office of

Immigration & Litigation, Washington, DC, for Respondent.

Before ESCHBACH, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Romanian husband and wife Ovidiu Teodorescu and Christina Dobrota seek review of a decision of the Board of Immigration Appeals (BIA) that denied Teodorescu's application for political asylum.[1] Teodorescu argues that the BIA's failure to consider certain evidence and its reliance on improper considerations require that his case be remanded. He also contends that the evidence compels a finding that his conviction in Romania for the crimes of "damaging public property" and "disturbing the public silence" constituted political persecution. Although we express concern over both the BIA's failure to address specific evidence in its opinion and the unexplained delay in this matter, in light of our highly deferential review standard we affirm the BIA's decision because current conditions in Romania appear to reflect no threat to the petitioners.

I.

Petitioner Ovidiu Teodorescu is thirty-six years old and a native and citizen of Romania. In 1986 Romania was under the leadership of communist president Nicolae Ceaucescu, and Teodorescu, an anti-communist and member of the National Peasant Christian Democratic Party, was pursuing an advanced science degree at Romania's University of Brasov. When Teodorescu was asked to join the Communist Party—a requirement for earning his degree—he refused, and as a result was not allowed to sit for his third-year exams.

In February 1987, unable to complete his degree or find employment, Teodorescu applied for a passport. According to Teodorescu, requests for passports were

---

1. Petitioners seek review only of Teodorescu's application. If Teodorescu is granted asylum, Dobrota will also be eligible for asylum under 8 C.F.R. § 208.20.

taken seriously by the Ceaucescu regime. Such requests were noted in the individual's security file, and often resulted in the loss of what Teodorescu calls "normal" rights. Local police summoned Teodorescu to their headquarters, insisting that he withdraw his passport application. When he refused, university police took him into custody, beat him, and attempted to intimidate him into withdrawing his application. According to Teodorescu, a university dean then falsely accused him of damaging school property and forced him to pay a large sum of money to avoid expulsion. He was unable to find a job because the Securitate—a state police force that operated to protect Ceaucescu and his fellow communists—provided his prospective employers with negative background reports.

In November 1987, Teodorescu and a friend went to the university, wrote anti-government slogans on blackboards, and removed a picture of Ceaucescu from a wall in order to demonstrate their support for striking workers. Other students informed on Teodorescu, and he was arrested the next day and charged with "damaging public property and disturbing the public silence." He remained in custody awaiting trial for two months, during which time he claims to have been beaten five or six times. Teodorescu was convicted on January 20, 1988, and sentenced to five years in prison. Six days later, however, President Ceaucescu declared a limited amnesty for short-term, first-time prisoners, and Teodorescu was released on February 23, 1988. After his release, Teodorescu was unable to find employment due to his criminal conviction.

In December 1989 the Ceaucescu regime was overthrown. Teodorescu participated in the revolution, working as a roadblock guard for Ion Iliescu's provisional government until December 29, when he concluded that Iliescu was a "tyrant" much like Ceaucescu and that government personnel from the old regime remained in power. Because of continued political oppression, Teodorescu decided to leave Romania when passports became available in March 1990. Unwilling to wait seven months for an interview at the United States embassy in Bucharest, Teodorescu traveled to Austria instead, where he filed applications for political asylum in both Austria and the United States. After his United States asylum application was denied in November 1991, Teodorescu returned to Romania for a week. His Austrian asylum application was denied in March 1992, and he again returned to Romania for a week to arrange for his permanent departure. Teodorescu obtained a tourist visa to Mexico, but never intended to go there, as he planned instead to file a second application for asylum once his plane landed in New York City. Teodorescu filed his second application when he arrived in New York on March 19, 1992. At a hearing on September 4, 1992, Teodorescu admitted his excludability and requested relief in the form of asylum and withholding of deportation.

Following the hearing, the Immigration Judge (IJ) issued a written decision in which he recounted Teodorescu's testimony as well as a State Department advisory opinion. The advisory opinion, dated October 29, 1992, stated that while human rights received considerably greater protection under Iliescu, many Romanians continued to emigrate due to Romania's poor economy. The opinion also stated that Teodorescu left Romania too soon after Ceaucescu's overthrow to evaluate the nature of the new Iliescu government, and that his affiliation with the National Peasant Democratic Party would not subject him to persecution. While the IJ found Teodorescu's testimony detailed and specific, he faulted Teodorescu for his attempt to circumvent immigration laws by entering the United States on a tourist visa to Mexico and for failing to mention in his pending asylum application that he had previously been denied asylum in the United States. The IJ found Teodorescu's documentary evidence unhelpful as it concerned the general human rights situation in Romania rather than Teodorescu's spe-

cific situation. The IJ noted that Teodorescu had suffered no persecution since the overthrow of Ceaucescu, and that neither the denial of readmission to the University of Brasov nor Teodorescu's inability to find work was shown to be politically motivated. He cited Teodorescu's ability to obtain a passport as evidence that he would not face future persecution in Romania. The IJ concluded that Teodorescu had "failed to meet the well-founded fear standard" and ordered that he be excluded and deported.

After a six-year delay that is not explained in the record, the BIA agreed with the IJ's conclusion that his conviction could not be considered political persecution without more evidence that the government intended to punish him for his political beliefs. The BIA also agreed with the IJ that Teodorescu's ability to obtain a passport demonstrated that he had no well-founded fear of returning to Romania.

## II.

■ We review the BIA's decisions in asylum cases under a "highly deferential version of the substantial evidence test," see *Karapetian v. INS*, 162 F.3d 933, 936 (7th Cir.1998), and reverse BIA findings only if the evidence compels a contrary conclusion, see *INS v. Elias–Zacarias*, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

■ First, Teodorescu notes that because the BIA's decision in this case was delayed six years it was based on outdated information. We find this time frame troubling, and note that counsel for the INS was unable to offer an explanation at oral argument. *See also Salameda v. INS*, 70 F.3d 447, 449 (7th Cir.1995) (noting that "the proceedings of the Immigration and Naturalization Service are notorious for delay"). Nonetheless, Teodorescu has made no attempt to introduce new information. However, because current conditions in Romania are crucial to our decision in this matter, we take judicial notice of the State Department's most recent Romania Country Report, which characterizes Romania as a constitutional democracy. *See* U.S. DEPARTMENT OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1998—VOLUME II, at 1425–33 (April 1999). Though police brutality continues, the report notes, the Romanian government generally respects the rights of its citizens, and no political disappearances or killings were reported in Romania in 1998. The Romanian Constitution provides for freedom of expression, and the government respects its citizens' rights to freedom of association. Citizens freely exercise their rights to travel abroad, emigrate, and return. Though still not ideal, conditions in Romania have improved dramatically since petitioners' departure. Based on this 1998 Country Report—the only contemporary evidence before us—we conclude that petitioners have not established a well-founded fear of future persecution in Romania.

■ Teodorescu next contends that a remand is necessary because the BIA failed to consider an affidavit and supporting documentation prepared on his behalf by former Ambassador David Funderburk. Funderburk, who served as the United States Ambassador to Romania from 1981 through 1985 and lived in Romania for six years, wrote to the IJ in 1992 and encouraged him to grant Teodorescu asylum. Funderburk stated that he believed Teodorescu had been imprisoned for political reasons and would face future persecution if returned to Romania. He described the political situation in 1992 Romania as relatively unchanged despite the fall of Ceaucescu, and noted that many communist officials still wielded power. He described the tactics of the secret police and noted that "people are still followed, surveilled, threatened and beaten for their political activity." The supporting documents he provided included excerpts from the Congressional Record and various articles. Teodorescu argues that Funderburk's evidence was crucial to rebutting the State

Department opinion letter, which he claims the BIA credited. He concedes that while the Funderburk materials are insufficient to *compel* the finding that his fears of persecution were well-founded, the BIA may have nonetheless concluded otherwise had it considered them.

We have stressed the importance of independent evidence in asylum cases, particularly those in which the INS presents advisory opinions from the State Department on the likelihood of future persecution, as it did here. *See Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir.1997) (stating that "no responsible administrative or judicial body is going to give weight to unsubstantiated testimony that the alien believes that the bad guys are still running things"). In such cases the State Department opinion is inevitably given considerable weight, and the applicant must point to a "highly credible independent source of expert knowledge" in order to rebut the State Department evaluation. *See id.*

We have on occasion remanded immigration cases for an IJ's failure to provide a "reasoned treatment" of an applicant's argument, *see Hengan v. INS*, 79 F.3d 60, 63–64 (7th Cir.1996), or because an absence of analysis left us uncertain that a claim had been fully understood, *see Chitay–Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir.1999). While the BIA need not "write an exegesis" on every contention an applicant raises, *see Sanon v. INS*, 52 F.3d 648, 651 (7th Cir.1995), it must articulate its reasons for rejecting evidence favorable to a petitioner, *see Shahandeh–Pey v. INS*, 831 F.2d 1384, 1389 (7th Cir.1987) (remanding case to BIA). Here, the BIA's failure to explicitly address the probativeness of the Funderburk materials hampers a meaningful review by this court. *See id.* Although we are disturbed by both the age of this case and the absence of any specific mention of the now somewhat dated Funderburk submissions, we nonetheless recognize that a remand would be futile in light of current conditions in Romania as reflected in the most recent State Department report.

Teodorescu also contends that the evidence compelled a finding that his arrest, conviction and imprisonment in Romania constituted past persecution. While Teodorescu has provided circumstantial evidence that the mistreatment he faced was due to his political views, it is far from clear that his three-month incarceration is severe enough to merit a grant of asylum on its own. Only in rare cases is past persecution "so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution." *See Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir.1997). Teodorescu's evidence of past persecution is thus insufficient to warrant a reversal.

Finally, Teodorescu challenges the BIA's conclusion that his "eventual ability to receive a passport" showed that his fears of persecution were not well-founded. This observation was proper: while Teodorescu had some difficulty obtaining a passport, he obtained one nonetheless, and issuance of a passport may constitute evidence that future persecution is unlikely. *See Urukov v. INS*, 55 F.3d 222, 229 (7th Cir.1995) (noting that applicant's ability to leave country with a valid passport undermined his political persecution argument).

### III.

Because we view Teodorescu's arguments in light of current country conditions in Romania, we are compelled to AFFIRM the BIA's decision.