In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3962

Marcel Pop,

Petitioner,

v.

Immigration and Naturalization Service,

Respondent.

On Petition for Review
From the Board of Immigration Appeals.
No. A71 030 710

Argued April 20, 2001--Decided January 28, 2002


   Before Easterbrook, Manion, and Kanne,
Circuit Judges.

   Kanne, Circuit Judge.  Petitioner Marcel Pop, a thirty-five-year-old native and citizen of Romania, sought asylum as a political refugee. The immigration judge ("IJ") denied Pop's application for asylum, and Pop appealed to the Board of Immigration Appeals ("BIA"), seeking a remand and alleging ineffective assistance of counsel. The BIA denied Pop's appeal because Pop was not prejudiced by his counsel's allegedly deficient performance. We affirm.

I.  History

   Pop, a native and citizen of Romania, entered the United States on February 8, 1991, and applied to the INS for political asylum. On May 17, 1993, the INS denied his request and began deportation proceedings. Pop then retained Judd Azulay to represent him during these proceedings. On December 14, 1993, Azulay filed a written application for asylum for Pop, in which Pop claimed that the oppressive Communist regimes under the dictatorship of Ceausescu persecuted him for his political beliefs. Further, Pop claimed that the Romanian government under Ion Iliescu, Ceausescu's democratically-elected successor, also persecuted him for his political beliefs. According to the application, in 1985,

Pop was approached by an unnamed person who asked him to join the Communist Party and that following his refusal to join, he was subjected to surveillance and interrogation by Ceausescu's notorious police force, the Securitate, regarding his political beliefs. Pop explained that after the execution of Ceausescu in December 1989, he joined the Liberal Party that opposed the then-interim government headed by Iliescu. Pop's application explained that he was active at Liberal Party meetings and in numerous demonstrations against the Iliescu government. Pop's application stated that in June 1990, he was arrested and detained for twenty-four hours on two occasions, and that during each detention, he was interrogated and beaten by the SIR, the successor to the Securitate. Pop's application further explained that the SIR warned him to cease his political involvement and criticism of the Iliescu government and that he was subsequently denied job promotions and salary increases on account of his beliefs. Finally, Pop's application stated that Pop believed he would be arrested and interrogated, be denied employment, have his life threatened, and be imprisoned because of his opposition to the then-current Iliescu government if he were to return to Romania.

Deportation hearings commenced on July 28, 1993, and Pop conceded deportability but sought asylum as a refugee. The proceedings were continued until November 4, 1994, at which time Azulay sought an additional continuance in order to submit several newspaper articles addressing the current socio-political conditions in Romania. This continuance was denied. Pop was then sworn as a witness and stated that the information in his asylum application was true and correct. Further, Pop testified that he had nothing to add to the application and that it adequately and completely represented his claim for asylum. Other than Pop's application, Azulay did not submit any additional evidence on Pop's behalf.

The IJ then issued his oral decision. The IJ began by reviewing the information contained in Pop's application regarding his political activities in Romania. The IJ then reviewed an Advisory Opinion from

the State Department ("Advisory Opinion"), which stated that conditions in Romania had been profoundly transformed since Ceausescu's overthrow in 1989 and that the current government respected civil liberties. The Advisory Opinion explained that political conditions in Romania had improved, and therefore, past mistreatment under Ceausescu or in 1990 would not lead to mistreatment by the current government. The IJ concluded that Pop had not established either past persecution or a well-founded fear of future persecution and thus, he denied Pop's claim for asylum.

On November 4, 1994, Azulay filed a Notice of Appeal and on March 30, 1995, Azulay filed a brief that challenged, inter alia, the IJ's conclusions on asylum. Pop retained new counsel and on August 6, 1998, filed a motion to reopen or in the alternative, to remand his case./1 The motion asserted that Azulay provided ineffective assistance to Pop by failing to properly investigate all of the facts of his case. Specifically, the motion contended that Pop's asylum application lacked information regarding the granting of asylum to Pop's ex-wife, Mariana, based on the same factual background as Pop's claim. Pop also submitted his own affidavit, numerous newspaper articles, and an affidavit from Mariana in support of his motion to remand.

Initially, Pop's affidavit contended that Azulay failed to encourage him to contact Mariana and that Mariana would have supported his claim. Pop's affidavit did not detail any additional past persecution that Pop suffered but didoutline persecution suffered by Mariana and her mother. For example, Pop stated that he witnessed the Securitate question Mariana and her mother and that the Securitate harassed Mariana's mother and father for many years. The newspaper articles addressed various actions the Romanian government had taken since the fall of Ceausescu.

Mariana's affidavit stated that Pop left her in 1990, that she soon thereafter obtained a divorce, and that she and Pop did not talk again until 1995. Mariana stated that she came to the United States in November 1992 and was granted asylum

soon thereafter. Although she did not at tach her asylum application, Mariana detailed over fifteen years of persecution that she, her father, and her mother endured due to the actions of her father, a prominent member of the Jehovah's Witnesses. Mariana also stated that her family was persecuted by the Securitate because Mariana's aunt had emigrated to the United States, and that the Securitate sought information about her aunt. According to Mariana, the Securitate also attempted to recruit her to spy on her friends, family, and neighbors, but that Mariana refused to work with the Securitate. Further, Mariana stated that her and Pop's son, Alexander, was granted asylum because of her permanent resident alien status. Mariana's affidavit also supported Pop's claim that he was persecuted for his political opinions between 1985 and 1991. Finally, Mariana's affidavit stated that Mariana and Pop were active in opposing the Iliescu government from 1989 until 1991 and that Mariana was "certain that [Pop] will be persecuted if he returns to Romania, even though the government has changed again."

On October 17, 2000, the BIA denied Pop's appeal and his motion to remand. The BIA first addressed the appeal and noted that the facts presented in Pop's asylum application did not amount to past persecution. Further, the BIA noted that the 1992 State Department Country Report ("Country Report") indicated that political conditions in Romania had improved considerably, and thus made it unlikely that Pop would face persecution in the future. In denying Pop's motion to remand, the BIA found that Pop was not prejudiced by any alleged deficiency in Azulay's representation. The BIA noted that "current country conditions have [been] so altered as to remove any presumption that past mistreatment under Ceausescu or in the chaotic first year after his overthrow will lead to mistreatment in the future . . . despite the suspicions of some people regarding leaders who held office under the prior regime." The BIA also stated that Pop's fear of future persecution was not reasonable because it was based entirely on incidents that occurred prior to the 1992 elections. Addressing the newspaper articles, the BIA found that they undermined Pop's position because they

supported the IJ's conclusion that persons who express their political opinions in Romania are not currently persecuted by the Romanian government. The BIA concluded that Pop was not prejudiced by Azulay's allegedly deficient performance because Pop would still have been deported had Azulay done what Pop asserted was required. Pop then appealed the BIA's denial of his motion to remand.

II.  Analysis

  We review the BIA's decision to deny a motion to remand for abuse of discretion, mindful of the broad discretion we must afford such decisions. See INS v. Abudu, 485 U.S. 94, 110, 108 S. Ct. 904, 99 L. Ed. 2d 90 (1988). We must affirm the BIA's denial "unless it was made without a rational explanation, it inexplicably departed from established policies, or it rested on an impermissible basis." See Man v. INS, 69 F.3d 835, 837 (7th Cir. 1995) (quotation omitted). Pop argues that the BIA should have remanded his case because Azulay's performance was constitutionally deficient. In this circuit, however, whether there exists a constitutional right to effective assistance of counsel in immigration cases is virtually foreclosed. See Stroe v. INS, 256 F.3d 498, 501 (7th Cir. 2001) (implying that alien has no right to effective counsel unless INS acts as a "prosecutor"). Even assuming Pop's claim is not foreclosed, in order to succeed on such a claim, he must--at a minimum--show actual prejudice. See Mojsilovic v. INS, 156 F.3d 743, 749 (7th Cir. 1998). Because Pop has failed to establish actual prejudice, we need not determine the extent of the right to effective assistance of counsel in immigration cases.

  In order to obtain asylum, Pop must establish that he is a "refugee." See 8 U.S.C. sec. 1158(b)(1). A "refugee" is defined as one who is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. at sec. 1101(a)(42). If the alien demonstrates past persecution, a presumption arises that the alien has a well-founded fear of future persecution.

See 8 C.F.R. sec. 208.13(b)(1). This presumption is rebuttable if conditions in the country from which the applicant fled have changed to such an extent "that the applicant no longer has a well-founded fear of being persecuted" if he or she were to return./2 Id. at sec. 208.13(b)(1)(i)(A).

In his motion to remand, Pop argued that the IJ would have granted asylum status had he known of the additional evidence that Azulay failed to present. After examining this evidence, the BIA stated that the evidence supported the IJ's conclusion that with democratic elections in 1992, one could now express one's political opinion in Romania without fear of persecution. Relying on the 1992 Coun try Report, the BIA concluded that even considering the additional evidence, political conditions in Romania had changed to eliminate any well-founded fear of persecution that Pop may have if he was to return to Romania. Therefore, the BIA found that Pop was not prejudiced because had Azulay presented the additional evidence, Pop would still have been deported. We hold that the BIA did not abuse its discretion in so concluding.

In Dobrota v. INS, 195 F.3d 970, 973 (7th Cir. 2000), we noted that although police brutality continues, "the Romanian government generally respects the rights of its citizens, and no political disappearances or killings were reported in Romania in 1998." We stated that the Romanian Constitution now provides freedom of expression and that the government respects this right and freedom of political association. See id. We also noted that Romania, while not ideal, had improved dramatically since the alien's departure in 1992, and that citizens were allowed to exercise their rights without fear of persecution. See id. Because the alien had not presented any contemporary evidence concerning conditions in Romania, we concluded that he had failed to establish a well-founded fear of future persecution in Romania and affirmed the BIA's denial of asylum. See id.

In the present case, we agree with the BIA that conditions have changed in Romania to eliminate any well-founded fear of future persecution. The BIA's

conclusion that Romania is a safer place to express one's political opinion is supported by the 1992 Country Report, by our decision in Dobrota, 195 F.3d at 973, and by numerous other decisions by this court. See, e.g., Roman v. INS, 233 F.3d 1027, 1036 (7th Cir. 2000) (finding no well-founded fear of future persecution in Romania due to changed conditions); Vaduva v. INS, 131 F.3d 689, 692 (7th Cir. 1997) (same). Further, we find that the BIA did not abuse its discretion in holding that the additional evidence would not dictate a different result.

Pop asserts that Azulay should have submitted to the IJ numerous newspaper articles concerning Romania and an affidavit from his ex-wife, Mariana. In Vaduva, 131 F.3d at 691, we held that newspaper articles that pre-date a Country Report are not "probative of present conditions in Romania, and therefore of the risk [the alien] presently faces if he were to return to his native country." See also Dobrata, 195 F.3d at 973 (holding current conditions crucial inquiry). As in Vaduva, in the present case, many of Pop's articles pre-date the 1992 Country Report and are therefore not probative of present conditions in Romania. Further, the remaining articles support the conclusion that Romanians may express their political opinions without any danger of persecution, and thus support the IJ's conclusion that Pop lacks a well-founded fear of future persecution. Therefore, the articles' omission before the IJ did not prejudice Pop.

Further, Mariana's affidavit is not probative of any persecution Pop would face upon return for his political views. Although her affidavit supports Pop's contention that he was persecuted between 1985 and 1991, it does not contain any evidence that Pop would be persecuted if he were to return to Romania today. Indeed, in addressing any future persecution, the affidavit contains only the naked assertion that Pop "will be persecuted if he returns to Romania, even though the government has changed." However, in Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir. 1997), we stated that unsubstantiated, uncorroborated, and self-serving evidence concerning current political conditions in a country is not sufficiently credible evidence to reverse

the BIA or to rebut the BIA's reliance on a Country Report. In the present case, Mariana's affidavit does not substantiate her assertion with any details, and Pop fails to present any evidence corroborating Mariana's assertion. Therefore, her affidavit is not probative of any persecution Pop would face upon his return to Romania, see id., and its omission before the IJ did not prejudice Pop.

Finally, we reject Pop's contention that the BIA should have remanded his case because the INS granted asylum to Mariana./3 Although the granting of asylum to a family member may be relevant to the determination of the alien's status, it is not legally dispositive. See Karapetian v. INS, 162 F.3d 933, 937 (7th Cir. 1998). However, the relevance of the grant of asylum is dependant on the respective claims being based on the same facts and the same basis. See id. In that case, Karapetian and his half-brother left Georgia at the same time because of same religious persecution-- including physical attacks on their church--and filed for asylum "on the same day, and on the same grounds." Id. Because Karapetian's and his half-brother's claim were based "on the same religious basis, and the same facts," we questioned the INS's inconsistency in granting the half-brother asylum and not Karapetian. See id. However, we upheld the BIA's decision to deny Karapetian asylum because although relevant, the inconsistency was not legally dispositive. See id. at 937.

In the present case, Pop contends that "the IJ may have decided differently if Pop" had presented Mariana's status, because, Pop alleges, his claim and Mariana's claim are based on the same facts and on the same basis of persecution. We disagree. Pop and Mariana relied on materially different facts and bases to support their respective claims of asylum./4 Pop seeks asylum as a political refugee based on six years of political persecution. Mariana's affidavit, however, outlines over fifteen years of religious and social persecution, with only vague allusions to any political persecution. Therefore, the bases are materially different because Mariana's claim was based mostly on religious and social persecution whereas

Pop's claim was based on political persecution./5 Moreover, Mariana stayed in Romania after Pop left her, and thus, their claims are materially different because Mariana was persecuted for much longer than Pop and for approximately eighteen months after Pop left Romania. Therefore, unlike in Karapetian, Pop and Mariana's claims at most may overlap, but are not based on the "same" persecution and the "same facts." Any discrepancy in the treatment of their claims is well justified on those grounds, and the BIA did not abuse its discretion in concluding that the omission of Mariana's status did not prejudice Pop.

III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the BIA.

FOOTNOTES

/1 The BIA treated the motion as a motion to remand.

/2 If the past persecution is sufficiently heinous, an alien may be granted asylum even though conditions have changed and the alien lacks a well-founded fear of future persecution. See Bereza v. INS, 115 F.3d 468, 474-75 (7th Cir. 1997). Pop concedes that his past persecution does not rise to the level required to meet this standard. See, e.g., Bucur v. INS, 109 F.3d 399, 404-05 (7th Cir. 1997) (listing examples such as survivors of the Cambodian genocide).

/3 Pop attempts to frame the disparate treatment as an equal protection violation. Such an argument is without merit and does not warrant discussion.

/4 We also question whether one's ex-wife should be considered a "relative" for these purposes.

/5 Pop's brief to the BIA makes no mention of any religious or familial persecution against Pop. Thus, he is foreclosed from contending on appeal that he was persecuted for either reason. See Bereza, 115 F.3d at 474.