In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3339

TAHIR USEINOVIC,

*Petitioner*,

*v.*

IMMIGRATION AND NATURALIZATION SERVICE,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.

ARGUED SEPTEMBER 4, 2002—DECIDED DECEMBER 27, 2002

Before FLAUM, *Chief Judge*, and CUDAHY and KANNE, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Tahir Useinovic, a Yugoslavian, seeks asylum in the United States. An Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) both have found that Useinovic is ineligible for asylum because he can show neither past persecution nor a well-founded fear of future persecution. He petitions us to reverse the BIA's findings or to remand his case to the IJ so that he can seek suspension of deportation under the Nicaraguan Adjustment and Central American Relief Act (NACARA). We affirm the decision of the BIA.

I.

Tahir Useinovic is a 41-year-old Albanian Muslim native of the city of Bar, in the Republic of Montenegro portion of the Federal Republic of Yugoslavia (Yugoslavia).[1] He entered the United States legally as a visitor on May 15, 1990. Useinovic's wife, Ismeta Useinovic, to whom he has been married since 1987, joined him on May 19, 1992. They had a child born in the United States in 1994.

Useinovic applied for asylum to the Immigration and Naturalization Service (INS) and was interviewed by the INS on April 9, 1992.[2] In his application for asylum, Useinovic claimed that "[he] was mistreated every time [he] practiced [his] religion," and that "[b]ecause [he] was involved in demonstrations against the government of

---

[1] The Republic of Montenegro is (for the moment) one of the two constituent republics (along with Serbia) of Yugoslavia. With the victory of pro-independence parties in the October 2002 elections, Montenegro's continued participation in the Federal Republic of Yugoslavia is very much in doubt.

[2] It is not entirely clear from the Administrative Record when exactly Useinovic applied for asylum for the first time. There is no date of application on the sheet recording his first interview. Useinovic claims he applied on March 20, 1991. Pet. Br. at 11. The Record does contain an application with what appears to be Useinovic's signature and a date that could be March 20, 1991 (but it also appears that it could be March 20, 1996). Administrative Record (A.R.) at 413. However, there are three contradictory indications: 1) the form on which this signature appears is a form revised on November 16, *1994*, 2) the date stamped on the first page of the application shows its receipt on December 22, 1995 and 3) the signature occurs in a signature block designed for signing during the asylum application interview, not in an application date signature block. However, Respondent admits that Useinovic applied for asylum before December 31, 1991, Resp. Br. at 20, and a resolution of this issue is unnecessary for our ultimate disposition.

Communist Yugoslavia, [he] was detain [sic], jailed, beaten and then fired from [his] farm job." Finally, he asserted that if he were "forced to return to Yugoslavia, [he] will definitely be detained and either go to jail or [be] forced into the Yugoslavian Serbian war." Administrative Record (A.R.) at 380. Useinovic was issued a Notice of Intent to Deny his application (NOID) on February 28, 1995, and was ultimately denied asylum on April 11, 1995.

The INS issued an Order to Show Cause to Useinovic on March 27, 1995, charging him with deportability under then-section 241(a)(1)(C)(i) of the Immigration and Nationality Act (INA), for having overstayed his nonimmigrant tourist visa. *See* 8 U.S.C. § 1251(a)(1)(C)(i), *transferred* to § 1227(a)(1)(C)(i). At his hearing before the IJ on March 20, 1996, Useinovic conceded his deportability and renewed his request for asylum under 8 U.S.C. § 1158. He claimed "refugee" status under section 101(a)(42) of the INA as grounds for eligibility for asylum, asserting past persecution and a well-founded fear of future persecution based on his Albanian ethnicity, Islamic religious faith and anti-government political opinions and actions.[3]

Useinovic was the only witness at his hearing before the IJ. Based on his testimony and the few documents supporting his two applications for asylum, it is very difficult

---

[3] The relevant part of INA § 101(a)(42), codified at 8 U.S.C. § 1101(a)(42)(A), states that a refugee includes

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

for this court to construct a seamless, accurate and consistent timeline of Useinovic's experiences in Yugoslavia that accounts for the events he claims support his well-founded fear of persecution. What we can determine from his testimony and documentation is as follows. Sometime before or around 1977, Useinovic undertook his compulsory service in the military. Because he was an only child supporting his mother since his father's death, he was supposed to be eligible for shortened service of only 12 months. Instead, he served 15 months. Useinovic testified generally that this extension of time was punishment for his Islamic beliefs. He also claimed specifically that during his time in the army, in 1977, an officer approached him about joining the Communist Party. Useinovic testified that upon his refusal, the officer told him he "would have a lot of problems afterwards," and that Useinovic "believe[d] in something that did not exist." A.R. at 69. Presumably the officer was referring to Useinovic's religious beliefs.

Useinovic also claimed that difficulties in his work were relevant to his request for asylum.[4] At some time after his

---

[4] A review of the Administrative Record suggests that most of Useinovic's claims of work-related incidents occurred after his military service. However, there are indications that some problems, not specifically elucidated, occurred during a period of employment prior to military service. Useinovic's immigration documents detail his last year of schooling as the 1969-1970 school year, after which he graduated from a Yugoslavian analog to an American high school. And Useinovic is also clear in testifying that his military service occurred around 1977. The Record also shows that Useinovic described general employment difficulties after having "graduated school" (A.R. at 69), thereby indicating that he did work between school and military service and that he experienced some problems then. But there are no specific incidents for this period alleged to support his application for

(continued...)

military service, working either as a crane operator, or on a farm, Useinovic was again asked to join the Communist Party and again refused, but he did not claim any adverse consequences from this refusal. In 1989 and 1990, Useinovic participated in the organization of five labor strikes.[5] During his testimony, Useinovic recounted that he and some colleagues learned that two of their friends had been suspended from work for refusing a transfer to work that "they've never done before." A.R. at 85. Useinovic and colleagues on his shift felt they would also be asked to transfer between jobs in a similar fashion, and decided to start a strike. Ultimately, five days of strikes resulted, with the last one involving 1,600 workers. A.R. at 85. Useinovic testified that these demonstrations which he organized resulted in his eventually being fired from his position. He claimed that he was told to take a leave of absence because there was less work to be done at his job site. Useinovic came to the United States shortly thereafter "just for a visit," but received notice within a month that he had been fired. A.R. at 67-68.

Useinovic also testified that he faced persecution based on his Islamic beliefs. In addition to the comments of the military officer and to the extended military service noted above, he claimed that he generally faced problems because his cousin was a hadja, a leader within the

---

[4] (...continued)

asylum, nor are any such incidents expressly described in the Record. Useinovic's testimony concerning specific requests to join the Communist Party refers to the officer's request as the "first time," indicating that the work-related incidents we analyze above occurred subsequent to his military service. A.R. at 69.

[5] Useinovic's testimony implies that these strikes were related to his work as a crane operator; immediately before his testimony discussing the strikes he testified that he had "no problems" at his farm job. A.R. at 72.

Islamic community—a circumstance which caused changes in the attitudes of friends and coworkers. Although Useinovic admitted that he had never been arrested or mistreated by the police, he did testify that sometime around 1989-90 he had a fight over his Islamic faith with a coworker, which had scared him sufficiently that he did not go to work for "a couple of days." A.R. at 71, 73, 78, 82.

Finally, Useinovic also testified that he feared persecution if he returned to Yugoslavia based on a home invasion suffered by his mother in June of 1994. A translation of a police report indicates that during the night of June 11, 1994, two or more men broke into Useinovic's mother's house, tied her up and blindfolded her and stole money and jewelry. A.R. at 100. In his testimony, Useinovic claimed the invaders asked his mother, "[W]here is your son? When is he going to come back?" A.R. at 74. They told her that if he returned, they would harm him, and if she tried to escape her restraints, they would "do the same things [they] did in Bosnia." A.R. at 74, 76. Useinovic claimed that he later learned from a neighbor that the robbers had been sent by the local police. A.R. at 75.

In an oral decision at the hearing, the IJ denied Useinovic's request for asylum and granted him voluntary departure in lieu of deportation. Useinovic, the IJ found, was a credible witness. However, even taking as true the events described by Useinovic, he had not met his burden of proof to show eligibility for asylum. A.R. at 43. The judge found that Useinovic had presented no specific evidence that he had been denied any opportunity to practice his religion, and the specific remarks aimed at him did not rise to the level of persecution. Nothing about Useinovic's protest activities was political, religious or ethnic in nature; they were labor-related and they could not support a claim of past persecution. The IJ further found that his refusal to join the Communist Party

on the two occasions he had been asked to do so had had no serious repercussions. Finally, the judge found that the home invasion of his mother's house, four years after Useinovic left Yugoslavia, was a criminally motivated act, not a political or religious one.

Useinovic appealed to the BIA. The BIA denied his appeal on August 7, 2001. The BIA found that the events described by Useinovic did not rise to the level of persecution under the INA. Further, taking judicial notice of the changed country conditions in Yugoslavia along with its findings concerning the alleged past events, the BIA found that Useinovic could not demonstrate an objectively reasonable, well-founded fear of persecution. A.R. at 4. This petition for review timely followed.

II.

A.

The BIA's findings regarding asylum eligibility are factual findings that we review under the substantial evidence standard. *Ambati v. Reno*, 233 F.3d 1054, 1059 (7th Cir. 2000). We are required to affirm the BIA's decision if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Karapetian v. INS*, 162 F.3d 933, 936 (7th Cir. 1998) (quotations omitted). We will reject the BIA's findings only if "the evidence is 'so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

Useinovic was placed in deportation proceedings by the INS's March 27, 1995, Order to Show Cause. Because deportation proceedings began before April 1, 1997, the 1996 Amendments to the INA under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.

L. No. 104-208, 110 Stat. 3009 (IIRIRA), which substan-tially altered deportation procedures (and associated descriptive terminology[6]), do not apply to Useinovic's ac-tion. *See, e.g., Buzdygan v. INS*, 259 F.3d 891, 892-93 (7th Cir. 2001). Instead, the transitional rules in section 309(c) of the IIRIRA and the non-superseded sections of the INA apply, and, as a result, this case continues to be characterized as a deportation proceeding and request for asylum. *Id.*

The INA gives to the Attorney General the discretion-ary power to grant asylum to an alien who qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42). 8 U.S.C. § 1158(b)(1). Under § 1101(a)(42) a person becomes eligi-ble for "refugee" status by showing either past persecu-tion or a well-founded fear of future persecution if re-turned to her prior country of residence. Useinovic does not appeal the BIA's finding that the events he alleges do not rise to the level of past persecution. Instead, he claims on appeal that he has a well-founded fear of per-secution if returned to Yugoslavia on account of his Alba-nian ethnicity, Islamic religion and anti-government political opinions. A well-founded fear of persecution re-quires specific, detailed facts showing 1) a genuine (subjec-tive) fear of persecution upon return to the petitioner's home country, and 2) that the petitioner's fear is objec-tively reasonable. *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002); *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir. 1995) (requiring that "a reasonable person in the appli-cant's circumstances would fear persecution if returned").

---

[6] For example, under the IIRIRA, the INS no longer serves an "Order to Show Cause," but rather a "Notice to Appear." De-portation proceedings are now called "removal proceedings." Asylum is still asylum, but suspension of deportation is now called "cancellation of removal." *See* 8 U.S.C. §§ 1229, 1229a, 1229b.

B.

We first must dispose of Useinovic's claim that the BIA improperly took administrative notice of changed country conditions (as reported by the State Department) in Yugoslavia in making its determination. Our precedents make clear that the BIA may take administrative notice of changed country conditions in its determinations of eligibility for asylum. *Petrovic v. INS*, 198 F.3d 1034, 1038 (7th Cir. 2000) (affirming the BIA's administrative notice of changed country conditions in Yugoslavia and Croatia); *Kaczmarczyk v. INS*, 933 F.2d 588, 593-94 (7th Cir. 1991) (validating the BIA's administrative notice of the change of government in Poland, rendering unlikely the possibility that Solidarity members would be persecuted upon return to Poland). However, the BIA cannot "blindly apply" a noticed fact to deny automatically the asylum applications of that country's citizens. *Kaczmarczyk*, 933 F.2d at 594. The BIA must still engage in an individualized review of the applicant's case. *Petrovic*, 198 F.3d at 1038.

The BIA did engage in an individualized review of Useinovic's case. First, the situation recognized by the BIA's notice shows that the government Useinovic lived under in Yugoslavia, as well as the one he claimed to fear in his applications for asylum, was no longer in power—in fact the character of the government was completely different with both the overthrow of Communism and the removal of the Milosevic regime. Second, the remainder of the BIA's opinion is replete with individualized analysis of Useinovic's claims based on the hearing before, and the decision of, the IJ. The BIA carefully and succinctly contrasts the claims of Useinovic with his resulting testimony. For example, Useinovic claimed threats, verbal abuse, physical abuse and arrest based on his ethnicity and religion, but his testimony was that he had never been physically abused, arrested or jailed by the police or anyone else. A.R. at 3. This, and the

analysis that follows, was highly particularized to Useinovic's individual circumstances. The BIA's use of administrative notice was proper.

C.

Useinovic next claims that both the IJ and the BIA considered only the issue of past persecution and failed to consider a well-founded fear of future persecution as grounds for asylum eligibility. Because a well-founded fear of persecution was alleged and argued by Useinovic, and is a statutory ground for refugee status and eligibility for asylum, Useinovic argues that the failure of the IJ and BIA to consider such grounds requires reversal. Even if the IJ and BIA decisions can be read as reflecting consideration of a well-founded fear of future persecution, Useinovic further argues that their decisions "cursorily concluded" that such a fear was not objectively reasonable without adequate discussion of the factors leading to this conclusion. Pet. Br. at 7.

Even a cursory examination of the record makes clear that the IJ did render a decision on Useinovic's alleged well-founded fear of future persecution and found it to be unreasonable. A.R. at 41. The IJ, after outlining the reasonable person standard for establishing a well-founded fear of persecution, describes Useinovic's "claim of a fear of persecution," and details the past racial and religious incidents Useinovic alleged to support this claim. Further, the IJ goes on to to describe how Useinovic fears that he will face persecution for his organization of strikes and opposition to the government, evidenced, according to Useinovic, by the attack on his mother. A.R. at 42. Therefore, as an initial matter it is clear that the IJ did, in fact, make a determination with respect to Useinovic's claim of a fear of future persecution. Similarly, even Useinovic's own brief ultimately acknowledges that the BIA did, in

fact, make a determination on both grounds—past persecution and a well-founded fear of persecution. Pet. Br. at 7 ("While the BIA cursorily concluded that the appellant did not demonstrate a reasonable possibility of suffering persecution . . . .").

In the alternative, Useinovic claims that the BIA did not adequately explain its conclusion that he lacked an objectively reasonable fear of future persecution. The BIA, claims Useinovic, merely recounted the past incidents alleged by Useinovic. This claim fails as well. Useinovic appears to be trying to avoid the deferential substantial evidence standard of review by characterizing the BIA's conclusion as one of legal error, that is, incorrectly interpreting the INA. But he is, in reality, challenging the sufficiency of the evidence supporting the BIA's findings with respect to his fear of persecution—an appeal which actually invokes the substantial evidence standard. To that end, we must first examine the BIA's use of past incidents in its determination that there was no reasonable fear of future persecution. Then, after evaluating the BIA's mode of decision, we will examine the remaining challenge to the sufficiency of the evidence supporting the BIA's determination.

First, the use of past incidents to frame a determination of a well-founded fear of future persecution is not only routine, but highly probative. This approach is one of the principal ways of demonstrating the existence of a well-founded fear of persecution, because the existence of past incidents of persecution creates a rebuttable presumption of future persecution. *See Yadegar-Sargis v. INS*, 297 F.3d 596, 601 (7th Cir. 2002). However, past events forming the central basis for a petitioner's claim of a fear of future persecution may, in some circumstances, be found insufficient or irrelevant and unable to support eligibility for asylum. *See Ambati*, 233 F.3d at 1060-61 (examining alleged incidents of past persecution in deter-

mining whether petitioner had an objectively reasonable fear of future persecution); *Petrovic*, 198 F.3d at 1037-38 (finding no well-founded fear of persecution based on examination of evidence of past incidents and consideration of changed country conditions).

During his hearing before the IJ, Useinovic, when originally asked why he feared persecution, began recounting the list of alleged acts of past persecution that we have detailed. At the end of his testimony, Useinovic was asked again what he thought would happen if he went back to Yugoslavia. A.R. at 86. He responded, "Judging by all that has happened in the past, which I described here in the [c]ourtroom, I don't believe anything good could happen to me there." *Id.* Useinovic's claim of a fear of future persecution centered around the incidents he alleged from the past. The BIA's analysis of his claim of a fear of persecution was, therefore, inevitably centered around an examination of these past incidents.

However, even given the focus of Useinovic's claim upon past incidents in his life, the BIA did not, as Useinovic claims, limit its examination only to those past incidents. As already explained, very early in its opinion the BIA took administrative notice that Yugoslavia had undergone significant change in the eleven years since Useinovic left. A.R. at 3. Not only was the Communist regime that ruled when Useinovic emigrated no longer in power, but the dictatorial regime of Slobodan Milosevic had been replaced. *Id.* Therefore, the BIA's analysis of Useinovic's fear of persecution involved a consideration both of past incidents of alleged persecution and of changed country conditions within Yugoslavia. This was a sound and proper procedure for adjudicating Useinovic's claim.

So, ultimately we are left with a simple attack on the substantiality of the evidence considered by the BIA, which fails as well. There is substantial evidence support-

ing the BIA's decision, and a reasonable factfinder could find that there is not a well-founded fear of persecution. The BIA found that it was unlikely, eleven years and two regime changes later, that anyone in a position of power would remember Useinovic's activities or be motivated by those activities to persecute Useinovic. A.R. at 3. Useinovic testified that he was never arrested, beaten or jailed by the police. A.R. at 73, 82. Useinovic's testimony also shows that his anti-government activities consisted of refusing to join the Communist Party twice (resulting in no major consequences for him) and organizing labor strikes, which can be characterized, based on Useinovic's testimony, as involving labor issues rather than political questions. A.R. at 85 (testifying that the strikes originated as a protest against job transfers to jobs for which he and his colleagues were untrained). The only act of colorably political or religious retribution Useinovic could cite was the extension of his army service by 3 months. A reasonable factfinder could conclude that no reasonable person would fear persecution based upon these events, particularly in light of the changed country conditions. Useinovic did not suffer severe consequences for his actions at the time he acted, and the passage of time since these activities only lessened the likelihood he would face any persecution. The robbery of his mother years after he left the country does not alter this conclusion. This home invasion appears from the evidence, as the BIA noted, to have been motivated by criminal inclinations, not political retaliation. Useinovic has only hearsay within hearsay to indicate that the police may have been involved in the robbery, and slight evidence to indicate that the robbery was primarily aimed at him personally and not at his mother's valuables.

As to his religion, Useinovic testified that he was not active in his faith. A.R. at 70. The source of his problem appears from the evidence to have been not his own faith

but his relationship to his cousin, a local hadja. Other than isolated verbal confrontations, Useinovic presented no evidence that he had been targeted based on his religious beliefs, and no evidence that he would be so targeted upon his return.

In conclusion, there exists in the record substantial evidence supporting the BIA's determination that no reasonable person in Useinovic's position would fear persecution.

D.

Finally, Useinovic requests that we remand his case to the IJ so that he can seek relief under the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, 111 Stat. 2160, Title II, §§ 201 et seq. (1997). This request for relief points to a tortuous legislative trail that, at its end, reveals a simple outcome: Useinovic has pursued this remedy at the wrong time and in the wrong place.

To begin, Useinovic is requesting this court to remand his case to the IJ so that he can apply for suspension of deportation. This remedy would be added to the present appeal's application for asylum. The suspension of deportation was a form of discretionary relief from the Attorney General authorized by section 244 of the INA.[7] 8 U.S.C. § 1254, *repealed by* IIRIRA § 308(b)(7). To be eligible for suspension of deportation, an applicant needed to have been continuously physically present in the United

---

[7] This court has already issued a far more comprehensive exegesis on the legislative path from INA § 244 through the IIRIRA and on to the NACARA, and its consequent effects, to which interested readers should refer for more information. *See Angel-Ramos v. Reno*, 227 F.3d 942, 944-47 (7th Cir. 2000)

States for seven years, to have been a person of "good
moral character" during that period and to have estab-
lished that deportation would result in "extreme hardship."
INA § 244. With the passage of the IIRIRA, Congress
tightened eligibility for suspension of deportation, now
called "cancellation of removal." Specifically, convictions
of certain crimes precluded eligibility, the duration of
the required continuous physical presence was lengthened
to 10 years and the clock on an applicant's continuous
physical presence was stopped the moment the INS
served a Notice to Appear (the new incarnation of what
was previously referred to as an Order to Show Cause).
IIRIRA § 304(a)(3) (amending the INA to add, *inter alia*,
§ 240A(b)(1) & (d), codified at 8 U.S.C. § 1229b(b)(1) & (d)).
The stopping of the clock on continuous physical pres-
ence by a Notice to Appear (referred to as the "stop time"
provision of the IIRIRA) was a significant change in the
law because, previously, aliens involved in deportation
proceedings that were significantly delayed often accumu-
lated sufficient "continuous physical presence" to qualify
for a suspension of deportation. Under the IIRIRA, the
onset of removal proceedings froze an alien's eligibility
for cancellation of removal, regardless of any subsequent
delay. The IIRIRA's transitional rules (as modified by
the NACARA), referred to above, made clear that indi-
viduals like Useinovic, who were placed in deportation
proceedings before the enactment of the IIRIRA (and
were thus not proceeding under the provisions of the
IIRIRA generally), still faced the stop time provisions
of new INA § 240A(d)(1) & (2).[8] *See* NACARA § 203(a)(1)

---

[8] One of the intricacies of this process (explained in more detail
in *Angel-Ramos*) is the manner in which the IIRIRA's transitional
rules muddied the eligibility requirements for a suspension of
deportation for those in a transitional position—i.e., those in

(continued...)

(amending IIRIRA § 309(c)(5)). The result? An Order to Show Cause issued even before the IIRIRA took effect stopped the clock for the accumulation of any further continuous physical presence during an alien's deportation proceedings and froze an alien's eligibility for suspension of deportation in the same way that a Notice to Appear freezes eligibility for cancellation of removal.

However, the NACARA giveth as well as taketh away. The NACARA turned off the IIRIRA transitional rules' restrictions for certain individuals and left them within the INA § 244 criteria that were in place before the IIRIRA. *See* NACARA § 203(a)(1) (amending IIRIRA to add § 309(c)(5)); 8 C.F.R. § 3.43. Among such individuals are those aliens who entered the country on or before December 31, 1990, applied for asylum on or before December 31, 1991 and whose country of origin had been a signatory to the Warsaw Pact, including Yugoslavia. *See* NACARA § 203(a)(1) (amending IIRIRA to add § 309(c)(5)(C)(i)(V)); 8 C.F.R. § 3.43(d)(4)(iii).

So where are we? Useinovic, a Yugoslavian national who entered the United States before December 31, 1990, and who, according to Useinovic, applied for asylum before

---

[8] (...continued)

deportation proceedings before the IIRIRA went into effect, but whose cases were still pending after it went into effect. The problem was that the IIRIRA's transitional rules' restrictions on the continuous physical presence requirement, the "stop time" provisions, referred only to a "Notice to Appear," which was a term of art not in use for those people in deportation proceedings before the IIRIRA, like Useinovic. *See* IIRIRA § 309(c)(5). Such individuals had been served with an Order to Show Cause. The NACARA clarified this by sweeping into the IIRIRA's stop time restrictions those individuals served with an Order to Show Cause, whose deportation proceedings and applications for suspension of deportation were still pending. *See* NACARA § 203(a)(1), amending IIRIRA § 309(c)(5).

December 31, 1991, received an Order to Show Cause prior to the enactment of the IIRIRA. He is, therefore, very possibly someone to whom the stop time provisions of the IIRIRA do not apply, and his continuous physical presence time continued to accumulate even after the receipt of his Order to Show Cause. Now what? Stepping back in time to the end of 1997, and the enactment of the NACARA, what would a person in Mr. Useinovic's position have done to seek relief? The NACARA § 203(c) provided that, with its passage, any individual eligible for relief under its provisions could file a motion to re-open deportation proceedings and apply for suspension of deportation.[9] Section 203(c) also directed the Attorney General to specify a time frame during which newly eligible individuals could file motions to reopen based on the NACARA. Within the limitations of the NACARA, the Attorney General promulgated regulations requiring that motions to reopen under the NACARA be filed no later than September 11, 1998, with the corresponding application for suspension of deportation to follow no later than November 18, 1999. 8 C.F.R. § 3.43(e).

Here is where the facts begin to turn against Mr. Useinovic. He has never filed a motion to reopen his deportation proceedings and to seek relief under the

---

[9]  This was significant for a person in Useinovic's position. The IJ had rendered a final decision on his petition on March 20, 1996. Under 8 C.F.R. § 3.23, Useinovic had 90 days to file a motion to reopen his proceedings before the IJ. By the time the NACARA was enacted, this window for filing was closed. Only the NACARA's special provisions would have given him, and those similarly situated, an avenue for relief. *See Motion To Reopen: Suspension of Deportation and Cancellation of Removal*, 64 Fed. Reg. 13663, 13666 (March 22, 1999) ("[NACARA § 203] made special provisions to permit a certain group of people who would otherwise be prevented by statute and regulation to submit a motion to reopen.").

NACARA. This appears to be fatal to Useinovic's claim. First, Useinovic raises his alleged eligibility for relief under the NACARA for the first time before this court. But before this court could consider such a claim, Useinovic would have first had to present it to the BIA and to exhaust his administrative remedies. Absent such exhaustion, this court would lack jurisdiction to hear Useinovic's claims. 8 U.S.C. § 1105a(d), repealed by IIRIRA § 306(b);[10] *see Toptchev*, 295 F.3d at 721. This was an issue that Useinovic clearly could have brought to the attention of the BIA. Second, even if this court were able to consider Useinovic's request (transforming it into a direct request for NACARA relief), we would find him ineligible. He failed to apply for relief within the time mandated by the statute and the Attorney General's regulations. *See* NACARA § 203(c) (requiring the application period for relief to begin no later than 60 days after the NACARA's enactment and to extend for not more than 240 days). Looking only to the mandate of the statute, the opening date for application would have been, at the latest, January 18, 1998, and the last date on which a motion to reopen could have been filed under the statute would have been September 15, 1998. Useinovic not only failed to meet the deadline of the Attorney General's regulations, he also did not meet this statutorily set deadline. Because he has not exhausted his administrative remedies and, alternatively, has failed to meet the NACARA's deadlines, he can find no relief under the NACARA from this court.

## III.

The BIA's decision was supported by substantial evidence, and its use of administrative notice of changed country

---

[10] The principle of administrative exhaustion was preserved in the IIRIRA § 306(a)(2), codified at 8 U.S.C. § 1252(d).

conditions was proper. Useinovic cannot seek suspension of deportation under the NACARA by raising that issue for the first time before this court. Not only has he failed to exhaust his administrative remedies, but such an application is untimely. The decision of the Board of Immigration Appeals is, therefore, AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*